## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELLY GOLDSMITH, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. _____ |
| UBS FINANCIAL SERVICES INC., | **CLASS ACTION COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff, on behalf of herself and the proposed Class defined herein, seeks redress for the harm caused by Defendant's conduct. In support of her Complaint, Plaintiff alleges the following:

### I.        NATURE OF THE ACTION

1.        This case concerns a simple ruse: instead of fulfilling its fiduciary duties and a regulatory mandate to act only in the best interests of its clients, Defendant implemented, and continues to implement, a scheme whereby it uses its clients' cash balances to generate massive profits for itself while shortchanging its clients—in flagrant violation of its duties to its clients.

### II.        JURISDICTION AND VENUE

2.        This Court has subject matter jurisdiction under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d). Plaintiff is diverse from Defendant and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

3.        This Court has personal jurisdiction over Defendant because it conducts substantial business in this district and has its principal place of business here.

4.        Venue is proper in this district under 28 U.S.C. § 1391.

### III.   PARTIES

5.      Plaintiff Kelly Goldsmith is a citizen of South Carolina who maintained retail brokerage accounts that were managed on an advisory basis with Defendant UBS Financial Services Inc. ("UBS").  Ms. Goldsmith's accounts (ending in 43, 44 and 93) with UBS were opened in approximately 2013 and were closed in 2023.

6.      For the advisory accounts that Ms. Goldsmith maintained, UBS was designated as an Investment Advisor. Since at least 2021, Ms. Goldsmith's cash balances in her advisory accounts were swept into one of UBS's Sweep Programs, the "UBS Insured Sweep Program," as defined below in Section IV.A.

7.      Defendant UBS is a Delaware corporation with its principal place of business in New York, New York, and is a registered broker-dealer and investment adviser with the SEC.

### IV.   FACTUAL ALLEGATIONS

8.      A significant source of income for UBS is net interest income. Net interest income is the difference between the amount of interest that UBS pays to or secures for the benefit of its brokerage and advisory clients and the amount of interest that UBS and its affiliates earn on those cash balances themselves.

9.      UBS, like many financial services companies, offers "cash sweep" programs to its clients. Cash sweep programs figuratively "sweep" clients' cash balances into interest-bearing accounts at a network of banks.

10.     UBS makes more money when its clients' funds are invested in the UBS cash sweep programs rather than in similar cash options and equivalents.

11.     For its clients who are in the UBS cash sweep programs, UBS pays and/or secures interest rates on the clients' cash balances that are neither reasonable nor in compliance with its legal duties.

**A.      UBS's Sweep Programs**

12.      UBS offers three cash sweep programs for retail investors: (1) the UBS FDIC-Insured Deposit Program ("FDIC Program"); (2) the UBS Deposit Account Sweep Program ("Deposit Program"); and (3) the UBS Insured Sweep Program ("UBS-ISP").

13.      The FDIC Program is available to retail clients holding revocable or irrevocable trusts, so long as none of the beneficiaries are business entities, and sweeps the clients' cash into one or more FDIC insured accounts.

14.      The Deposit Program is available only to retirement advisory accounts. The Deposit Program sweeps UBS's clients' cash balances into an account at UBS Bank US or UBS AG.

15.      The UBS-ISP is available to retail accounts that are not retirement advisory accounts. The UBS-ISP sweeps UBS's clients' cash balances first into UBS Bank US and then into one or more other Program Banks on UBS's Priority List.

16.      The interest rates paid on balances in the FDIC Program, the Deposit Program, and the UBS-ISP are the same.[1]

17.      Collectively, the FDIC Program, the Deposit Program, and the UBS-ISP are referred to as UBS's "Sweep Programs."

18.      UBS fails to pay to or secure for its clients a reasonable rate of interest on the cash balances in its Sweep Programs.

19.      As of August 5, 2024, the interest rates UBS paid to or secured for its clients with cash in the Sweep Programs were:[2]

---

[1]      UBS Cash Sweep Programs, UBS, available at https://www.ubs.com/us/en/wealth-management/misc/account-sweep-yields.html (accessed Aug. 5, 2024).

[2]      Sweep and Savings Yields, UBS, available at https://www.ubs.com/us/en/wealth-management/misc/account-sweep-yields.html (accessed Aug. 5, 2024).

| From | To | Annual Percentage Yield |
|---|---|---|
| $0 | $249,999 | 0.05% |
| $250,000 | $999,999 | 0.10% |
| $1 million | $1,999,999 | .40% |
| $2 million | $4,999,999 | .50% |
| $5 million | and above | 1.05% |

20.    The interest rates that UBS paid to or secured for its clients during the period that Ms. Goldsmith maintained her account with UBS were materially the same as those set forth in the preceding paragraph.

21.    The interest rates UBS pays to or secures for its clients in the Sweep Programs violate UBS's duties to its clients because the rates are not reasonable, which constitutes a breach of UBS's fiduciary duties to its clients and falls below the standard of care set out in Regulation Best Interest, 17 CFR § 240.15l-1 (2019) (hereinafter "Reg. BI").

22.    UBS's continual sweep of Ms. Goldsmith's and the Class members' cash into the Sweep Programs during the entire period in which they held accounts with UBS constitutes a continuing wrong and was a continuing breach of UBS's duties to Ms. Goldsmith and the Class members. Each time UBS placed Ms. Goldsmith's and the Class members' cash into the Sweep Programs, UBS newly injured Ms. Goldsmith and the Class members.

**B.    UBS's Duties to Its Clients**

23.    UBS owes duties to its clients based on the type of relationship it has with the client. For example:

   a.    for all retail brokerage advisory accounts (i.e. accounts managed by an investment adviser), UBS is required to act as a fiduciary to its clients, meaning it must act for the benefit of its clients and not its own self-interest; and

4

      b.   for all retail brokerage non-advisory client accounts (i.e. non-managed accounts), UBS is required to always act in the "best interests" of its clients.

### 1.  UBS's Duties Under the Advisers Act

24.    When UBS acts as an Investment Adviser for client accounts, it owes its clients a fiduciary duty. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

25.    "The Advisers Act establishes a federal fiduciary duty for investment advisers. This fiduciary duty is based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id.*

26.    Under this federal duty, UBS "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

27.    If there is a conflict between UBS's interests and its client's interests, then UBS is also required to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*

28.    UBS "must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *Id.*

29.    UBS's fiduciary duties also include a duty of care to carry out its responsibilities in an informed and considered manner and to act as an ordinary prudent person would act in the management of her or her own affairs. In addition, because UBS becomes a fiduciary on the basis of representations of special skills or expertise, it is under a duty to use those skills and expertise for the benefit of its clients.

## 2. UBS's Duties Under Regulation Best Interest (Reg. BI)

30.     Where UBS is acting in its capacity as a broker-dealer, it is obligated to act in its clients' best interests under Reg. BI. 17 C.F.R. § 240.151-1.

31.     Reg. BI incorporates "key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320. Reg. BI and common law principles of fiduciary obligations "generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[3]

32.     Under Reg. BI, the investor "will be entitled to a recommendation … or advice … that is in the best interest of the retail investors and that does not place the interests of the firm or the financial professional ahead of the interests of the retail investor." 84 Fed. Reg. 33318, 33321.

33.     Reg. BI consists of a "General Obligation," which states, "When making a recommendation, a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests." 84 Fed. Reg. 33318, 33320.

34.     Within the General Obligation are more specific duties, including disclosure duties and a duty to avoid and disclose conflicts of interest.

35.     These specific duties require disclosure of "all material facts relating to conflicts of interest … that might incline a broker-dealer to make a recommendation that is not disinterested, including, for example, conflicts associated with proprietary products, payments from third parties, and compensation arrangements." 84 Fed. Reg. 33318, 33321.

---

[3]     *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations (June 7, 2024), available at www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

36.    Part of a broker-dealer's obligation under Reg. BI is to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

37.    One component of a broker-dealer's duty to disclose conflicts of interest concerns compensation. "The receipt of higher compensation for recommending some products rather than others, whether received by the broker-dealer, the associated person, or both, is a fundamental and powerful incentive to favor one product over another." 84 Fed. Reg. 33318, 33364.

38.    Pursuant to Reg. BI, UBS was required to act in the best interests of its clients when recommending an account type to its clients, including "understanding of the characteristics of a particular type of account [and] should consider, without limitation, factors such as the services and products provided in the account (including ancillary services provided in conjunction with an account type)."[4]

39.    The SEC recently reiterated that compensation, revenue, and other benefits from cash sweep programs give rise to a conflict of interest for both broker-dealers and investment advisers.[5]

40.    UBS's default placement of Ms. Goldsmith's and the Class members' cash into the Sweep Programs constitutes a "recommendation" within the scope of Reg. BI, and as a result, UBS was required to act in the best interests of its client when making that recommendation.

---

[4]    *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Account Recommendations for Retail Investors (June 7, 2024), available at https://www.sec.gov/tm/iabd-staff-bulletin.

[5]    *See* Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflict of Interest (June 12, 2024), available at https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

41.     Under Reg. BI, UBS was and is obligated to elevate its clients' interests above its own, to avoid conflicts with clients' interests, and to disclose material facts concerning any conflicts that may exist.

### C.    UBS Breaches Its Duties and Profits Thereby

42.     UBS breaches its duties to pay or secure reasonable interest rates for its clients' cash deposits.

43.     Although UBS does not define the term "reasonable," according to the term's dictionary definition, it is synonymous with "fair" and "proper."[6]

44.     IRS regulations define an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

45.     In 2003, in the context of discussing certain transaction restrictions in ERISA, the Department of Labor provided the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other clients of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

46.     Under any definition of the term, UBS did not pay or secure "reasonable" rates of interest to Plaintiff and proposed Class members.

---

[6]     *See* Reasonable, Black's Law Dictionary (12th ed.).

47.    The rates offered by UBS through its Sweep Programs are significantly lower than sweep programs at other brokerage and advisory firms. For example, the following chart compares UBS's Sweep Programs' rates with those of two comparable programs:

| Cash Balance | UBS's Sweep Programs' Rates[7] | Vanguard Sweep Rate[8] | InteractiveBrokers Sweep Rate[9] | Fidelity[10] |
|---|---|---|---|---|
| Less than $250,000 | 0.05% | 4.6% | 4.83% | 4.98% |
| Between $250,000 million and $999,999 | 0.10% | 4.6% | 4.83% | 4.98% |
| Between $1 million and $1,999,999 | 0.40% | 4.6% | 4.83% | 4.98% |
| Between $2 million and $4,999,999 | 0.50% | 4.6% | 4.83% | 4.98% |
| $5 million and above | 1.05% | 4.6% | 4.83% | 4.98% |

48.    Thus, other brokerage and advisory financial institutions that use sweep programs pay or secure significantly higher rates than UBS's Sweep Programs.

49.    Money market fund rates also provide a benchmark for determining what constitutes a "reasonable rate" and /or a reasonable alternative investment for clients' cash.

---

[7]    Sweep and Savings Yields, UBS, available at https://www.ubs.com/us/en/wealth-management/misc/account-sweep-yields.html (accessed Aug. 5, 2024).

[8]    *See* Vanguard Cash Plus Account, available at https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account  (accessed Aug. 5, 2024).

[9]    *See* Safeguard Your Assets with Our Insured Bank Deposit Sweep Program, https://www.interactivebrokers.com/en/accounts/sweep-program.php (accessed Aug. 5, 2024); Interest Rates, available at https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php, (accessed Aug. 5, 2024).

[10]    *See* Help your cash work harder, available at https://www.fidelity.com/go/manage-cash-rising-costs (accessed Aug. 5, 2024).

50.     UBS offers a money market fund for cash sweep, but it only offers that option to 403(b) plans,[11] qualified pooled plans, and corporate cash management accounts. That option was not available to Plaintiff or the other Class members. The money market fund that UBS offers to 403(b) plans, qualified pooled plans, and corporate cash management clients pays significantly higher interest rates than UBS's Sweep Programs.[12]

51.     Some of UBS's competitors automatically sweep any uninvested cash deposited into its clients' brokerage accounts into money market funds that earn comparably high rates of interest. For example, by default, Fidelity sweeps uninvested cash in its clients' brokerage accounts into a money market fund currently earning approximately 5%.[13]

52.     Likewise, competing firms Vanguard and Interactive Brokers offer cash sweep rates of 4.6% and 4.83% respectively.

53.     In contrast, UBS's Sweep Programs offer as little as 0.05% for Plaintiff and Class members.

54.     UBS has devised a scheme by which it generates significant profits using clients' cash balances. The scheme is devised to maximize profits for UBS while at the same time disregarding its clients' best interests – in fact, UBS generates interest income on its clients' cash balances that are orders of magnitude greater than amounts the client receives.

---

[11]     403(b) plans are similar to 401(k)s for those who work in public education or nonprofits.

[12]     Sweep and Savings Yields, UBS, available at https://www.ubs.com/us/en/wealth-management/misc/account-sweep-yields.html (accessed Aug. 5, 2024).

[13]     *See* Help your cash work harder, available at https://www.fidelity.com/go/manage-cash-rising-costs (accessed Aug. 5, 2024).

**D.    UBS Benefits from Its Misconduct**

55.    UBS earns interest revenue on non-trading assets that it holds for its clients; this includes cash deposits and other capital that is not deployed for trading purposes.

56.    The difference between what UBS earns on the deposits in the Sweep Programs and what it pays its clients is the company's net interest income.

57.    A significant portion of income reported by UBS AG, UBS's parent company,[14] is net interest income generated by its Global Wealth Management business division—the business unit that provides investment-related advice and services for customer funds and serves as a broker-dealer for UBS AG's clients, and of which UBS is a part.

58.    UBS's net revenue is heavily impacted by its net interest income. In 2023, UBS AG reported that its Wealth Management division generated $6.965 billion in net interest income.[15]

59.    UBS AG reported that its "businesses are sensitive to changes in interest rate trends," and a prolonged low period of interest rates may "adversely affect[] the net interest income" generated by UBS AG.[16]

60.    Changes in interest rates also mean that UBS's clients may decrease their cash deposits. As UBS AG reported, "[c]ustomer deposit outflows could require UBS to obtain alternative funding, which would likely be more costly than customer deposits."[17]

61.    Thus, UBS has a significant financial interest in (1) not paying clients a reasonable interest rate and keeping as much of the "spread" as it can, and simultaneously (2) not disclosing

---

[14]    UBS AG owns 100% of UBS. Annual Report 2023, UBS Group, at p. 403, available at https://www.ubs.com/content/dam/assets/cc/investor-relations/annual-report/2023/files/annual-report-ubs-group-2023.pdf .

[15]    Annual Report 2023, UBS Group, at p. 78.

[16]    *Id.* at p. 67.

[17]    *Id.*

to its clients the unreasonable interest rates it pays (as well as the company's inherent conflict of interests), lest the clients pursue accounts with reasonable rates at other institutions.[18]

**E.    UBS Increased the Rates It Pays to or Secures for Its Clients**

62.    In an implicit admission that its cash sweep programs violated its obligations to its clients, UBS AG recently reported "that by the middle of the fourth quarter [UBS AG] intends to adjust the sweep deposit rates in U.S. advisory accounts, with the company expecting a reduction in pretax profits by around $50 million annually."[19]

## V.    CLASS ACTION ALLEGATIONS

63.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

64.    Plaintiff brings this class action and seeks certification of the following Class:

> **Retail clients of UBS who had cash deposits or balances in UBS's Sweep Programs.**

65.    Excluded from the Class are governmental entities, institutional and other non-retail investors; UBS, UBS AG, UBS Bank and any of their affiliates, legal representatives, employs, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class, including other attorneys and staff at each respective firm.

66.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

---

[18]    *See* https://www.fidelity.com/go/manage-cash-rising-costs ("Compare our rates to the competition/See how much more your cash could earn in a Fidelity brokerage account").

[19]    *After UBS earnings, is cash sweep drama over?*, InvestmentNews (Aug. 14, 2024) available at https://www.investmentnews.com/broker-dealers/news/after-ubs-earnings-is-cash-sweep-drama-over-256318.

**Numerosity**
**Rule 23(a)(1)**

67.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. However, UBS markets itself as a "leading global wealth manager" backed by $5.8 trillion in invested assets.[20] Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

68.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a.   whether the interest rates paid to or secured for UBS's retail clients in UBS's cash sweep programs are "reasonable";

   b.   whether UBS owed a fiduciary duty to the Class, and whether UBS violated that duty;

   c.   whether UBS owed a duty to the Class under Reg. BI, and whether UBS violated that duty;

   d.   whether UBS was unjustly enriched by its wrongful conduct;

   e.   whether and to what extent Class members are entitled to damages and other monetary relief; and

---

[20]     Q24 Corporate profile, UBS, available for download at https://www.ubs.com/us/en/wealth-management/our-approach/financial-advisors.html.

f.   whether and to what extent Class members are entitled to attorneys' fees and costs.

**Typicality**
**Rule 23(a)(3)**

69.   Plaintiff's claims are typical of the Class's claims because she was a retail account holder with UBS who received an unreasonable interest rate on her cash sweep balances. Thus, Plaintiff's claims are typical of other Class members' claims as they arise from the same course of conduct by Defendant, and the relief sought is common to Class members.

**Adequacy of Representation**
**Rule 23(a)(4)**

70.   Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

**Superiority**
**Rule 23(b)(3)**

71.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense required for each Class member to individually litigate their claims against Defendant. It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done to them.

72.   Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single

proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

73.     Superiority is particularly satisfied in these circumstances, where the law of a single state will apply to all state law claims. Under the uniform contract terms with UBS, the law of New York will apply to each Class member's state law claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

74.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### Brought on Behalf of the Class Against Defendant

75.     Plaintiff, on behalf of herself and the Class, re-alleges the paragraphs above as if fully set forth herein.

76.     UBS owed fiduciary duties to Class members who maintained cash deposits or balances in UBS's Sweep Programs (including IRAs).

77.     UBS's fiduciary duties include, but are not limited to:

    a.   a duty of undivided loyalty;

    b.   a duty to act in the best interests of its clients;

    c.   a duty of care;

    d.   a duty not to place UBS's interests above those of its clients;

    e.   a duty to avoid conflicts of interest; and

    f.   a duty to disclose any conflicts of interest.

78.     UBS violated each of the foregoing duties when it (1) failed to pay to or secure for Plaintiff and the Class a reasonable rate of interest; (2) failed to act in Plaintiff's and the Class's best interests by not providing a reasonable default for cash balances that paid its clients a reasonable rate of interest on cash balances; (3) placed its own interests in realizing financial gain from net interest income ahead of Plaintiff and the Class's interests in obtaining a reasonable rate of interest; (4) maintained and failed to reasonably disclose its conflict of interest in securing increased net interest income at the expense of its clients; (5) failed to recommend to Plaintiff and the Class a cash sweep program that would pay a reasonable rate of interest.

79.     UBS's conduct damaged Plaintiff and the Class.

80.     Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**Brought on Behalf of the Class Against Defendant**

81.     Plaintiff, on behalf of herself and the Class, re-alleges the paragraphs above as if fully set forth herein.

82. As a result of UBS's wrongful conduct, Plaintiff and the Class received lower interest payments on their cash and other deposits than they would have in a reasonable and fair market.

83. As a result of UBS's wrongful conduct, UBS was unjustly enriched and Plaintiff and the Class conferred a benefit upon UBS because UBS received significantly greater net interest income than it would have but for its wrongful conduct.

84. UBS appreciated, knowingly accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the Class.

85. It would be inequitable and unjust for UBS to retain these wrongfully obtained benefits.

86. UBS's retention of these wrongfully obtained benefits would violate fundamental principles of justice, equity, and good conscience.

87. Plaintiff and the Class are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest.

## VII.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, demands judgment and relief as follows:

1. For an order certifying the proposed Class, and appointing Plaintiff and her counsel to represent the proposed Class;

2. For an order awarding Plaintiff and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

3. For an order awarding Plaintiff and Class members restitution, disgorgement, or such other and further relief as the Court deems proper; and

4. For an order awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII.   JURY TRIAL DEMAND

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues so triable.

DATED: August 22, 2024

Respectfully submitted,

 /s/ Matthew L. Dameron
Matthew L. Dameron (NY Bar No. 5081773)
Clinton J. Mann
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:    (816) 945-7110
Facsimile:    (816) 945-7118
matt@williamsdirks.com
cmann@williamsdirks.com

and

Thomas I. Sheridan, III (NY Bar No. 1398791)
Sona R. Shah (NY Bar No. 2927242)
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue
New York, NY 10016
Telephone:    (212) 784-6404
Facsimile:    (212) 213-5949
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

and

Bruce D. Oakes
Richard B. Fosher
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, Missouri 63144
Telephone:    (314) 804-1412
Facsimile:    (314) 428-7604
boakes@oakesfosher.com
rfosher@oakesfosher.com

***Counsel for Plaintiff and the Proposed Class***