**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW DAVITT and KELLY GOLDSMITH, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-06354-GHW-GWG |
| Plaintiffs, | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| UBS FINANCIAL SERVICES INC., | |
| Defendant. | |

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................. 1

II.  PARTIES ............................................................................................................. 4

    A.    Plaintiffs .................................................................................................. 4

    B.    Defendant ................................................................................................ 4

    C.    Relevant Non-Parties............................................................................. 5

III. THE AGREEMENTS BETWEEN THE PARTIES............................................ 5

IV.  JURISDICTION AND VENUE......................................................................... 15

V.   UBS'S CASH SWEEP ACCOUNT MISCONDUCT ................................... 15

    A.    UBS's Cash Sweep Programs ..................................................... 15

    B.    UBS's Acknowledgements of Its Duties and Obligations to Cash Sweep
        Program Clients.................................................................................... 18

    C.    UBS Offered Financial Advice on Swept Cash, Charged an Advisory Fee
        on Cash Allocations, and Exercised De Facto Control Over Brokerage
        Client Accounts With Respect to the Cash Sweep Program ...................... 22

    D.    UBS Used Its Affiliated Bank, UBS Bank USA, to Siphon Net Interest
        Income from the Billions of Dollars of Its Clients' Cash Sweep Deposits . 24

    E.    UBS Established Unreasonably Low Interest Rates on the Billions of
        Dollars Its Clients Held in Cash Sweep Accounts ...................................... 25

    F.    UBS Has Unjustly Enriched Itself by Paying Unreasonably Low Interest
        Rates on Its Clients' Bank Sweep Deposits .................................................. 27

    G.    UBS Owes Several Independent Duties and Obligations to Its Clients...... 31

        1.    UBS Owes Fiduciary Duties to Its Clients........................................ 32

        2.    UBS Has a Contractual Obligation to Charge No More than Is
            Reasonable for Its Cash Sweep Program and to Place its Clients'
            Interests Ahead of Its Own ................................................................ 37

3.  UBS Has a Legal Obligation to Make Reasonable Arrangements Regarding Its Clients' Cash Balances in Qualified Retirement Accounts ................................................................. 38

4.  UBS Has a Contractual Obligation to Base Its Sweep Account Interest Rates on the Industry, the Market, and Prevailing Business and Economic Conditions ............................................ 39

5.  UBS's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for UBS to Provide Clients with a Reasonable Rate of Interest ............................................................. 40

H.  UBS Breached Its Duties, Contracts and the Implied Covenant, and Profited Thereby ................................................................. 40

I.  UBS Secured and Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits ................................................................. 42

1.  Sweep Account Rates Paid by Other Institutions ............................. 43

2.  The Federal Funds Rate Benchmark ................................................ 47

3.  The Interest Rates on Sovereign Short-Term Debt Benchmark ....... 48

4.  The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements ................................................................. 49

CLASS ACTION ALLEGATIONS ................................................................. 50

FIRST CLAIM FOR RELIEF Breach of Contract ............................................ 54

SECOND CLAIM FOR RELIEF Breach of the Implied Covenant of Good Faith and Fair Dealing ................................................................. 55

THIRD CLAIM FOR RELIEF Breach of Fiduciary Duty .................................. 56

FOURTH CLAIM FOR RELIEF Unjust Enrichment ........................................ 57

DEMAND FOR RELIEF ................................................................. 57

JURY TRIAL DEMAND ................................................................. 58

## I.    <u>INTRODUCTION</u>

1.    This class action arises out of UBS Financial Services Inc.'s ("UBS") drastic under-payment of interest to its clients in its cash sweep programs applicable to the cash balances held by clients in their brokerage accounts at UBS.[1]  While acting as its clients' agent vis-à-vis its cash sweep programs, UBS underpaid its clients in violation of its fiduciary and contractual duties, in order to enrich itself and its affiliates, including UBS Bank USA, at its clients' expense.  Rather than pay its clients a fair and reasonable rate of interest on their cash and put their interests above its own, including by properly or reasonably taking into account "prevailing business and economic conditions," as it was required to do in the context of its Cash Sweep Program, UBS instead paid *de minimis* rates to its clients while it and its affiliates improperly earned billions of dollars on that cash in periods of rising interest rates.

2.    In a typical cash sweep program for a brokerage client, the brokerage firm, acting as its client's agent with respect to the cash sweep program, establishes and maintains the account(s) on its clients' behalf and automatically transfers cash from the client's brokerage account into an interest-bearing bank account that generates returns for the client.  However, when UBS sweeps its clients' cash through its Cash Sweep Program, UBS uses that cash to generate returns primarily for itself and its affiliates, including UBS Bank USA, rather than its clients, due to the spread between the interest income that UBS earns on the cash and the amount of interest that it pays its clients.

3.    As an agent of its clients with respect to its Cash Sweep Program, UBS is required to act as a fiduciary in the best interests of its clients in connection with the Program.  That includes

---

[1] Collectively, all of these programs are referred to herein as the "Cash Sweep Program" or the "Program."

a duty to put its clients' interests ahead of its own when recommending and/or conducting transactions for them within the scope of its Cash Sweep Program. In addition, the agreement between UBS and its clients carries with it an implied covenant of good faith and fair dealing.

4.      Rather than act as a fiduciary in the best interests of its clients with respect to its Cash Sweep Program or fulfill its contractual and implied covenant obligations to its clients, UBS used its clients' funds to enrich itself and its affiliates at their expense.

5.      UBS underpaid interest to sweep account clients, including by controlling and increasing the profits to itself and its affiliates by channeling its clients' cash sweep deposits to affiliated—rather than independent third party—banks. This included UBS's use of its affiliate, UBS Bank USA, to funnel cash from its clients' accounts to UBS Bank USA through its Cash Sweep Program to thereby capture even greater profits from the Program. In the subsequent years, UBS thereby increased its Net Interest Income (the difference between the interest earned on the cash and the interest amounts paid to clients) due to the clients' swept cash, resulting in massive profits.

6.      Periods of rising interest rates presented an opportunity for UBS clients to earn significant interest on their cash sweep account balances. By improperly keeping the interest rates paid by UBS Bank USA on cash sweep accounts artificially low, however, UBS usurped that opportunity for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself and its affiliates. This windfall in Net Interest Income also constituted an excessive fee that UBS reaped directly from its clients' holdings.

7.      In setting UBS's cash sweep interest rates—which UBS has kept largely static over the past several years—UBS ignored business and economic conditions. For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been

above 5.25% for most of the past year.  By contrast, for years the vast majority of UBS clients with cash sweep accounts have only been paid interest rates of 0.01% to 0.50%.

8.      There is nothing reasonable or fair about the rates UBS secured for, and paid to, its clients with cash sweep accounts or about UBS and its affiliates using its clients' cash balances to reap windfall profits.

9.      Nor does UBS set its sweep interest rates based on competitive interest rates; brokerages that do *not* sweep their cash to affiliated banks (as UBS does) typically pay far higher interest rates than UBS.

10.     UBS partially recognized the fact that it has underpaid interest.  After the SEC opened investigations into brokerage firms' under-payment of interest on cash sweep accounts, UBS raised its rates on certain select accounts.  Specifically, on August 14, 2024, UBS's parent announced that UBS would raise the rates it pays customers on cash sweep deposits in advisory accounts by an unspecified amount, and that these higher rates would be implemented in the middle of the fiscal fourth quarter of 2024.  UBS Group AG's CFO Todd Tuckner said that it was too soon to identify what the new rates would be, but that the increase was expected to reduce UBS America's Wealth Division's profits by $50 million annually.  Analysts estimated that the gross impact of the change was significantly higher than $50 million, as UBS would be using increases in other fees to offset the impact of the raised interest rates on UBS's bottom line.  UBS's move to increase certain rates failed to remedy the broader past and current financial harm that UBS's conduct imposed, and is imposing, on its clients, including those in non-advisory accounts.

11.     UBS's misconduct constituted, and continues to constitute, an ongoing series of breaches of its fiduciary duties, of its contracts with accountholders, and of the implied covenant of good faith and fair dealing.  Indeed, UBS's behavior was particularly harmful to its clients who

have suffered through record inflation over the past few years. Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by UBS's misuse of its cash sweep programs to enrich itself at the expense of its clients.

## II.    PARTIES

### A.    Plaintiffs

12.    Plaintiff Andrew Davitt is a citizen of the Commonwealth of Pennsylvania. He maintained brokerage accounts with UBS managed on an advisory basis, in addition to a retirement account in which cash was held over the course of the life of the accounts. Mr. Davitt's advisory accounts were opened in 2015 and 2019, and his retirement account was opened in 2019. The cash balances in Mr. Davitt's advisory accounts and retirement account were automatically "swept" into interest-bearing bank accounts pursuant to the Cash Sweep Program, and he received unreasonably low interest on those deposits.

13.    Plaintiff Kelly Goldsmith is a citizen of South Carolina. She maintained brokerage accounts with UBS that UBS managed on an advisory basis. Ms. Goldsmith's accounts with UBS were opened in approximately 2013 and were closed in 2023. For the advisory accounts that Ms. Goldsmith maintained, UBS was designated as an Investment Advisor. Since at least 2021, the cash balances in Ms. Goldsmith's advisory accounts were "swept" into the Cash Sweep Program, and she received unreasonably low interest on those deposits.

### B.    Defendant

14.    Defendant UBS Financial Services Inc. is a financial services company incorporated in Delaware with its principal place of business in New York, New York. UBS is a broker-dealer and investment adviser registered with the SEC. UBS is an indirect, wholly-owned subsidiary of non-party UBS AG, which is in turn a wholly-owned subsidiary of non-party UBS

Group AG.  UBS provides financial planning and advice, as well as brokerage services to clients through its financial advisors.  Among the products and services it offers are cash management and banking products, including the Cash Sweep Programs.

      **C.**     **Relevant Non-Parties**

      15.    Non-Party UBS Group AG is a holding company based in Switzerland with operations worldwide.  Through its subsidiaries, including non-party UBS AG, Defendant UBS, and non-party UBS Bank USA, UBS Group AG provides banking, wealth management, asset management, and investment banking services.

      16.    Non-Party UBS Bank USA is a national banking association and an indirect wholly-owned subsidiary of UBS AG, which is in turn a wholly-owned subsidiary of non-party UBS Group AG.  Because Defendant UBS is also an indirect, wholly-owned subsidiary of UBS Group AG, UBS Bank USA is an affiliate of Defendant UBS.

      17.    Non-Party UBS AG is a bank and financial services firm and a wholly owned subsidiary of UBS Group AG.  Through UBS AG Stamford Branch, UBS AG receives uninsured deposits, makes loans, and engages in other similar activities associated with a U.S. branch of a foreign bank.  The UBS AG Stamford Branch is not a separate legal or capitalized entity from UBS AG.  Because Defendant UBS is also an indirect, wholly-owned subsidiary of UBS Group AG, UBS AG is an affiliate of Defendant UBS.

**III.**     **THE AGREEMENTS BETWEEN THE PARTIES**

      18.    As Defendant UBS acknowledges, "The terms of the Sweep Program are contained in a Client Relationship Agreement (the 'CRA') that clients," including Mr. Davitt and Ms. Goldsmith, "receive and execute when they open their UBS brokerage account(s), and Program Disclosure Statements (the 'Disclosure Statements'), which are expressly referenced and incorporated in the CRA and updated periodically." ECF No. 45 at 1.

19.      Specifically, in opening an account with Defendant, Mr. Davitt executed a CRA with Defendant dated January 19, 2015. ECF No. 46-2. Mr. Davitt's CRA states that it "outlines the terms and conditions of your relationship with [UBS Financial Services Inc.]. By maintaining your Accounts at UBS, you agree to these terms and conditions and the other agreements and disclosures we refer to here." ECF No. 46-3.

20.      Mr. Davitt's CRA further states that it "applies to all of your Accounts at UBS, including any Accounts you may already have with us and Accounts you may open in the future." Under the subheading "Our Sweep Options and Your Sweep Election," Mr. Davitt's CRA went on to state in relevant part that:

> By signing this Client Relationship Agreement you authorize and direct us to deposit or invest your available cash balances on each business day in your Sweep Option and to withdraw your funds from, or liquidate your shares in your Sweep Option, as described in this section and in the General Terms and Conditions in the Agreements and Disclosures booklet, and any amendments.

21.      Under the subheading, "Entire Agreement and Changes to the Agreement," Mr. Davitt's CRA stated that:

> This Client Relationship Agreement and the related documents, including the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire "Agreement" between you and UBS Financial Services Inc. or UBS Financial Services Incorporated of Puerto Rico with respect to your Account(s).
>
> The accounts and services we offer may change over time. We may change our Agreement with you at any time by sending you a written notice of the change, and the changes will be effective on the date of the notice unless we specify a later date. We also may cease to offer services at any time without prior notice. Your continued use of your Accounts and our products and services constitutes your acceptance of the new terms and conditions. All changes by you to the Agreement will become effective only if offered in writing and signed by us.

22.      Ms. Goldsmith previously executed a Master Account Agreement (as the CRA was formerly called) with Defendant on March 23, 2007. ECF No. 46-4. Ms. Goldsmith then entered

into a CRA with Defendant in February 2013. ECF No. 46-5. Ms. Goldsmith's CRA also stated

that it "outlines the terms and conditions of your relationship with [UBS Financial Services Inc.].

By maintaining your Accounts at UBS, you agree to these terms and conditions and the other

agreements and disclosures we refer to here." ECF No. 46-5.

23.    Ms. Goldsmith's CRA also further stated that it "applies to all of your accounts at

UBS, including any Accounts you may already have with us and Accounts you may open in the

future." Under the subheading "The Bank Deposit Program and Alternative Sweep Options," Ms.

Goldsmith's CRA also stated, in relevant part that:

> You authorize and direct us on each business day to deposit or invest your cash
> balances in your Sweep Option and to withdraw your funds from, or liquidate your
> shares in, your Sweep Option as described in this section and in the General Terms
> and Conditions in the Agreements and Disclosures booklet, and any updates.

24.    Under the subheading, "Entire Agreement and Changes to the Agreement," Ms.

Goldsmith's CRA also stated that:

> Client Relationship Agreement and the related documents, including the General
> Terms and Conditions and the rest of the Agreements and Disclosures booklet form
> the entire "Agreement" between you and [UBS Financial Services, Inc.] with
> respect to your account(s). This Agreement supersedes any prior representations or
> agreements.
>
> The accounts and services we offer may change over time. We may change our
> Agreement with you at any time by sending you a written notice of the change, and
> the changes will be effective on the date of the notice unless we specify a later date.
> We also may cease to offer services at any time without prior notice. Your continued
> use of your Accounts and our products and services constitutes your acceptance of
> the new terms and conditions. All changes by you to the Agreement will become
> effective only if offered in writing and signed by us.

25.    The CRAs of both Mr. Davitt and Ms. Goldsmith expressly incorporate any updates

to the Agreements and Disclosures booklet, i.e., the Disclosure Statements, and their relationships

with UBS at any given time were, and are, governed by the version of the Agreement and

Disclosures booklet that was, and is, operative at the relevant time. UBS most recently updated its Agreements and Disclosures booklet in June 2024.

26.     As clients of UBS throughout 2018, Mr. Davitt and Ms. Goldsmith (and other Class members) were owed obligations under UBS's Agreements and Disclosures booklet, updated in 2018, wherein UBS promised that when it acts as a broker-dealer, UBS has a "duty to deal fairly with you,"  and "Consistent with our duty of fairness, we are obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that the commissions *and other fees we charge you are not excessive*." It further provides that when a client participates in a UBS advisory program, UBS's responsibilities include to "act in what we reasonably believe to be your best interests, and *in the event of a conflict of interest, place your interests before our own*." As set forth in greater detail throughout Section V of this Complaint, UBS breached these obligations to Mr. Davitt and Ms. Goldsmith (and other Class members) to not charge excessive fees and to place their interests above its own.

27.     As clients of UBS throughout 2018 and 2021, Mr. Davitt and Ms. Goldsmith (and other Class members) were owed obligations under UBS's Agreements and Disclosures booklet, updated 2018 and 2021, wherein UBS promised that with respect to the Bank Sweep Programs, "*Interest rates will be established periodically based on prevailing business and economic conditions*, as well as the nature and scope of your relationship with us." Mr. Davitt (and other Class members) who were clients of UBS throughout 2024, were also party to the Agreements and Disclosures booklet, updated June 2024, which contained identical language. As set forth in greater detail throughout Section V of this Complaint, UBS breached this obligation to Mr. Davitt and Ms. Goldsmith (and other Class members) to base interest rates on "prevailing business and economic conditions."

28.     Similarly, UBS promised Mr. Davitt and Ms. Goldsmith (and other Class members) in the Agreements and Disclosures booklet, updated 2018 and 2021, that "Interest rates paid on funds in your Deposit Accounts at [UBS] Bank USA and, if applicable, the AG Stamford Branch, are determined by [UBS] Bank USA and the AG Stamford Branch, respectively, in their discretion based upon a variety of factors, including economic and business conditions." And as clients of UBS throughout 2024, Mr. Davitt (and other Class members) were owed obligations under UBS's Agreements and Disclosures booklet, updated June 2024, wherein UBS similarly promised that "Interest rates paid on balances in your Deposit Accounts at [UBS] Bank USA, AG Stamford Branch and the Program Banks are based upon a variety of factors, including economic and business conditions." As set forth in greater detail throughout Section V of this Complaint, UBS breached this obligation to Mr. Davitt and Ms. Goldsmith (and other Class members) to base interest rates on "economic and business conditions."

29.     UBS promised Mr. Davitt and Ms. Goldsmith (and other Class members) under the heading "Our Responsibilities as an Investment Adviser under the Investment Advisers Act," in the Agreements and Disclosures booklet, updated 2018, that "When you participate in one of our investment advisory programs, we are considered to have a fiduciary relationship with you under the Investment Advisers Act of 1940." UBS also promised Mr. Davitt and Ms. Goldsmith (and other Class members) in the Agreements and Disclosures booklet, updated 2018 and 2021, that it would act as their "agent" with respect to various aspects of the Cash Sweep Program. UBS continued to make either identical or analogous promises to Mr. Davitt pursuant to the Agreements and Disclosures booklet, updated June 2024. Specifically, in the Agreements and Disclosures booklet from 2018 to 2024, UBS promised Mr. Davitt and Ms. Goldsmith (and other Class members) that with respect to the Bank Sweeps Programs:

9

- "UBS, *as your agent*, will satisfy any debits or charges in your Securities Account by withdrawing funds as set forth in the General Terms and Conditions."

UBS also promised Mr. Davitt (and other class members) in the Agreements and Disclosures booklet, updated June 2024, that:

- "Under the Bank Sweep Programs, *UBS acts as your agent* in establishing Deposit Accounts at [UBS] Bank USA, AG Stamford Branch and the Program Banks and depositing funds into them and withdrawing funds from them."

- "With respect to the Deposit Program, when Free Cash Balances in your Securities Account are first available to be swept to [UBS] Bank USA, UBS, *acting as your agent*, will open a Deposit Account on your behalf at [UBS] Bank USA."

- "When Free Cash Balances in your Securities Account are first available to be swept, UBS, *as your agent*, will establish a Deposit Account for you at [UBS] Bank USA, the first bank on the Priority List."

UBS also promised Mr. Davitt and Ms. Goldsmith (and other Class members) in the Agreements and Disclosures booklet, updated 2018 and 2021, that:

- "Under the Bank Sweep Programs, *UBS acts as your agent* in establishing Deposit Accounts at Bank USA and the AG Stamford Branch, and depositing funds into them and withdrawing funds from them."

- When "Free Cash Balances in your Securities Account are first available to be swept to Bank USA (as described in the Agreements and Disclosures booklet), UBS, *acting as your agent*, will open Deposit Accounts consisting of a transaction account (TA) and a money market deposit account (MMDA) on your behalf at [UBS] Bank USA."

- "*Acting as your agent*, UBS will deposit Free Cash Balances into your MMDA."

This "agency" language independently suffices to give rise to the fiduciary duties UBS owed Mr. Davitt and Ms. Goldsmith (and other Class members) throughout their participation in the Cash Sweep Program. As set forth in greater detail throughout Section V of this Complaint, UBS breached these fiduciary obligations to Mr. Davitt and Ms. Goldsmith (and other Class members).

10

30.     UBS represented to Mr. Davitt and Ms. Goldsmith (and other Class members) in the Agreements and Disclosures booklet, updated 2018 and 2021, that:

- "UBS may modify or terminate either Bank Sweep Program at any time ***in its sole discretion***."

- "UBS may, ***in its sole discretion*** and without notice, terminate your participation in a Bank Sweep Program at any time."

- "UBS, ***in its discretion***, may determine a minimum, or 'threshold,' amount to be maintained in your [transaction account] to satisfy debits in your Securities Account."

- "All Banks, except [UBS] Bank USA, will pay UBS a fee equal to a percentage of the average daily deposit balance in your Deposit Accounts at the Bank. The fee may vary from Bank to Bank, and may be as much as 2.5% annually on some of the Deposit Accounts. ***In its discretion***, UBS may reduce its fee and may vary the amount of the reductions among clients."

UBS continued to make those first three representations in the Agreements and Disclosures booklet, updated 2024, but replaced the fourth representation to Mr. Davitt (and other Class members) with the following:

- "All Program Banks will pay [UBS] Bank USA a fee equal to a percentage of the average daily deposit balance in your Deposit Accounts at the Program Bank. The fee may vary from Program Bank to Program Bank. ***In its discretion***, UBS may reduce its fee and may vary the amount of the reductions among clients."

The Agreements and Disclosures booklet, updated 2024, additionally represented to Mr. Davitt (and other Class members) that:

- "We may change the eligibility requirements for the Bank Sweep Programs at any time ***at our discretion***. In addition, we may grant exceptions to the eligibility requirements for the Bank Sweep Programs ***at our discretion***."

UBS's "discretion" over its Cash Sweep Programs confirms the fiduciary nature of the relationship between UBS and Mr. Davitt (and other Class members) with respect to their Cash Sweep accounts.

31.     As alleged above, Mr. Davitt and Ms. Goldsmith (and certain other Class members) have advisory relationships with Defendant. Both Mr. Davitt and Ms. Goldsmith's CRAs, which state that "By maintaining your Accounts at UBS, *you agree to* these terms and conditions and the other agreements and *disclosures we refer to here*," also specify that UBS communicates through "*Form ADV disclosure brochures*."  Moreover, the 2018 Agreements and Disclosures booklet, which the relevant CRAs themselves expressly incorporated, stated:

> At the beginning of our advisory relationship, we will give you our Form ADV brochure, which provides detailed information about, among other things, the program(s) you select; the advisory services we provide; our fees, personnel, other business activities and financial industry affiliations; and conflicts between our interests and your interests.

Accordingly, at all relevant times, UBS's operative "Form ADV disclosure brochure" was, and is, incorporated by reference into the terms of UBS's relationships with its advisory clients, including Mr. Davitt and Ms. Goldsmith (and certain other Class members).

32.     As a retirement accountholder of UBS since 2019, Mr. Davitt (and certain other Class members) were owed obligations under UBS's Form ADV disclosure brochure "about our Retirement Plan Consulting Services Program and Retirement Plan Guided Solutions Programs," operative March 30, 2020, wherein UBS promised that when it acts as a broker-dealer, UBS has a "duty to deal fairly with you,"  and "Consistent with our duty of fairness, we are obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that the commissions *and other fees we charge you are not excessive*." It further provides that when a client participates in a UBS advisory program,

UBS's responsibilities include to "act in what we reasonably believe to be your best interests, and *in the event of a conflict of interest, place your interests before our own*." UBS reiterated this language in its Form ADV disclosure brochures for investment advisory programs on at least August 18, 2022, March 31, 2023, and March 30, 2024. Because Ms. Goldsmith (and certain other Class members) were advisory clients of UBS throughout 2022, UBS owed identical duties. As set forth in greater detail throughout Section V of this Complaint, UBS breached these obligations to Mr. Davitt and Ms. Goldsmith (and certain other Class members) to not charge excessive fees and to place their interests above its own.

33.    As advisory clients of UBS throughout 2023 and 2024, Mr. Davitt (and certain other Class members) were also owed obligations under the UBS Form ADVs for its "retail wrap fee investment advisory programs and Alternative Investments Advisory Program" and "retail and institutional wrap fee and advice-only investment advisory programs," dated March 31, 2023 and March 30, 2024, respectively. They state that "UBS Bank USA reviews the rates payable to clients on a daily basis in the UBS Deposit Sweeps versus other sweep programs available through broker-dealers *to ensure such rates are aligned with the industry and market*." The Form ADVs further state that the "rates of interest paid on sweep deposits are determined by a UBS Bank USA interest rate committee that considers *prevailing business and economic conditions*, as well as interest rates paid by competitors' bank sweep deposit programs." As set forth in greater detail throughout Section V of this Complaint, UBS breached these obligations to Mr. Davitt (and other Class members) to ensure interest rates are "aligned with the industry and market" or based on "prevailing business and economic conditions, as well as interest rates paid by competitors' bank sweep deposit programs."

34.    Similarly, as advisory clients of UBS throughout 2022, Mr. Davitt and Ms. Goldsmith (and other Class members) were also owed obligations under the UBS Form ADV for its "retail wrap fee investment advisory programs and Alternative Investments Advisory Program," dated August 18, 2022, wherein UBS promised, "Interest rates on the deposit accounts held at UBS Bank USA are determined by UBS Bank USA and are ***competitive relative to similar deposit sweep programs in the industry***. These interest rates depend on the ***general level of interest rates*** in the US economy[.]" As set forth in greater detail throughout Section V of this Complaint, UBS breached these obligations to Mr. Davitt and Ms. Goldsmith (and other Class members) to ensure interest rates are "competitive relative to similar deposit sweep programs in the industry," and "depend on the general level of interest rates in the US economy."

35.    While UBS removed the language stating "When you participate in one of our investment advisory programs, we are considered to have a fiduciary relationship with you under the Investment Advisers Act of 1940" by 2021 from the Agreements and Disclosures booklet, UBS's Form ADVs contained identical language from at least March 30, 2020 through March 30, 2024. As advisory clients of UBS until 2023 and present, respectively, Ms. Goldsmith and Mr. Davitt maintained a fiduciary relationship with UBS throughout that time, as did the rest of the Class, as UBS acknowledged in its Form ADVs. As set forth in greater detail throughout Section V of this Complaint, UBS breached these fiduciary obligations to Mr. Davitt and Ms. Goldsmith (and other Class members).

36.    Regardless of the extent to which the language in the CRA, Agreements and Disclosure booklet, or the Form ADV disclosure brochure varied throughout the Class Period, UBS remained in breach of its obligations owed pursuant to the Cash Sweep Programs throughout

the Class Period, including with respect to certain material terms that UBS consistently agreed to, as set further set forth in greater detail throughout Section V of this Complaint.

## IV.    JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other class members are citizens of States different from Defendants.

38.    The Court has personal jurisdiction over Defendant because UBS conducts substantial business in this District and maintains its principal places of business here.

39.    Venue is proper under 28 U.S.C. § 1391 because, among other things, Defendant maintains its principal place of business in this District and a substantial part of the events and/or relevant conduct by Defendant and its subsidiaries giving rise to Plaintiffs' claims occurred in this District.

## V.    UBS'S CASH SWEEP ACCOUNT MISCONDUCT

### A.    UBS's Cash Sweep Programs

40.    UBS offers two cash sweep programs to its clients: (i) the UBS Bank Sweep Programs and (ii) the UBS FDIC-Insured Deposit Program ("FDIC Program").  The UBS Bank Sweep Programs are comprised of three further subdivisions: (i) the UBS Deposit Account Sweep Program ("Deposit Program"), (ii) the UBS Insured Sweep Program ("UBS-ISP"), and (iii) the UBS Business Account Sweep Program ("Business Program").

41.    The FDIC Program is the sweep program available to revocable and irrevocable trusts, as long as none of the beneficiaries is a for-profit business entity.

42.    The Deposit Program is the sweep program available to retirement advisory accounts, individual participant accounts under a defined contribution plan that are managed on a

discretionary basis, and Legacy Accounts (i.e., those enrolled in the Deposit Program prior to November 18, 2019).

43.    The UBS-ISP is the cash sweep program available to individuals, business entities, nonprofit organizations, revocable or irrevocable trusts owned by U.S. residents (so long as one or more beneficiaries is a business entity), all trusts owned by non-U.S. residents, custodial accounts (if none of the beneficiaries is a business entity), Legacy Accounts (including Legacy Business Accounts) that choose to opt in, individual retirement accounts, employee benefit plans, and retirement accounts owned or trusteed by a business.

44.    The Business Program is available only to Legacy Business Accounts (i.e., those enrolled in the Business Program prior to November 18, 2019), and individual participant accounts under a defined contribution plan that are managed on a discretionary basis.

45.    UBS offers both the Bank Sweep Programs (i.e., the Deposit Program, UBS-ISP, and the Business Program) and the FDIC Program as money settlement options that sweep uninvested cash daily to interest-bearing, FDIC-insured bank accounts. For each of these programs, depository insurance is provided by the FDIC, not by UBS. However, client cash swept from Legacy Accounts in the Business Program or Deposit Program in excess of $250,000 will not be FDIC-insured, as explained further below.

46.    The FDIC Program and UBS-ISP each sweep client cash to banks that are affiliated and unaffiliated with UBS. However, the vast majority of FDIC Program and UBS-ISP clients' cash is deposited with UBS's affiliate, UBS Bank USA. Available cash balances of these two programs' clients are swept daily to an interest-bearing deposit account at each Program Bank in accordance with the respective program's priority list. UBS Bank USA is the first bank on each priority list. Unaffiliated banks include Goldman Sachs Bank; Citibank, N.A.; and Truist Bank.

Regardless of whether the deposit accounts are held in banks affiliated or unaffiliated with UBS, the interest rate paid to clients participating in the FDIC Program or UBS-ISP is the same within each Interest Rate Tier of each program.

47.    When a client is enrolled in UBS-ISP or the FDIC Program, UBS, "acting as" the client's "agent," establishes a "Deposit Account" at UBS Bank USA and deposits Free Cash Balances in that Deposit Account.  Once the client's funds in the Deposit Account at UBS Bank USA reach $249,000 (or $498,000 for Joint Accounts of two or more individuals) (i.e., "the Deposit Limit"), UBS, again acting as the client's "agent," will "open a Deposit Account for [the client] at the next Program Bank on the Priority List and place [the] additional funds in that Program Bank."  $250,000 is the FDIC insurance limit for individuals, and $500,000 is the FDIC insurance limit for joint accounts.

48.    Most FDIC Program and UBS-ISP clients' accounts do not exceed the Deposit Limit.  As a result, the vast majority of FDIC Program and UBS-ISP clients' cash is deposited with the first bank on each priority list:  UBS's affiliate bank, UBS Bank USA.

49.    If a client is enrolled in the Deposit Program or the Business Program as their sweep option, UBS affiliated banks are the *only* bank options.  For all clients enrolled in the Deposit Program or Business Program, with the exception of Legacy Accounts, UBS, "acting as" the client's "agent," will deposit Free Cash Balances into a "Deposit Account" at UBS Bank USA, "without regard to the FDIC insurance limit."  For Legacy Accounts in either program, UBS will do the same for funds of only up to $250,000, whereas funds in excess of $250,000 are swept to UBS AG Stamford Branch without limit.

50.    The aggregate total of UBS cash sweep balances is staggering.  As of May 7, 2024, client cash sweep balances at UBS Group AG (which includes indirect, wholly-owned subsidiaries UBS Bank USA and UBS AG) were *$37.6 billion*.

51.    Balances subject to UBS's Cash Sweep Program were even higher earlier in the Class Period.  UBS reported its Cash Sweep Program balances of $69.2 billion as of March 6, 2023; $53.4 billion as of April 25, 2023; $45.5 billion as of August 31, 2023; $40.2 billion as of November 7, 2023; and $41.0 billion as of March 28, 2024.

**B.    UBS's Acknowledgements of Its Duties and Obligations to Cash Sweep Program Clients**

52.    UBS has repeatedly acknowledged numerous fiduciary, contractual, and implied duties to its clients with respect to its Cash Sweep Program, including to put its clients' best interests ahead of its own, not charge excessive fees, and properly and reasonably take into account "prevailing business and economic conditions" when setting interest rates for its clients' cash in the Cash Sweep Program.   However, UBS has acted directly contrary to such duties by appropriating for itself the profits that belong to its own clients.

53.    For example, the UBS Client Relationship Agreement states that it applies to "all your Accounts," including all "securities accounts, brokerage accounts, margin accounts, deposit accounts, investment advisory, [and] retirement accounts."   Under the heading "Our Role and Fiduciary Acknowledgement for Retirement Accounts" in the Client Relationship Agreements revised September 2021 and June 2023, UBS agreed that it will operate under the Department of Labor's Prohibited Transaction Exemption 2020-02, which requires UBS "to act in your best interest and not put [UBS's] ahead of yours."

54.    Specifically, UBS's Client Relationship Agreements revised September 2021 and June 2023 promise clients that, with respect to investment advice concerning retirement accounts,

UBS must (i) "Not put our financial interests ahead of yours (give loyal advice)"; (ii) "Follow policies and procedures designed to ensure that we give advice that is in your best interest"; and (iii) "Charge no more than is reasonable for our services."

55.     In UBS's Agreements and Disclosures booklet from 2018, UBS also states to clients that when UBS acts as a broker-dealer, UBS has a "duty to deal fairly with you," and "Consistent with our duty of fairness, we are obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that the commissions ***and other fees we charge you are not excessive***." It further provides that when a client participates in a UBS advisory program, UBS's responsibilities include to "act in what we reasonably believe to be your best interests, and ***in the event of a conflict of interest, place your interests before our own***." Though UBS removed this language from later iterations of its Agreements and Disclosures booklet, UBS began including identical language in its Form ADV no later than March 30, 2020. UBS continued to include this language in its Form ADVs dated August 18, 2022, March 31, 2023, and March 30, 2024.

56.     UBS acknowledges that its incentive to recommend that clients maintain cash balances in a sweep investment represents a conflict of interest.  For example, in UBS Form ADVs from at least March 30, 2020 through March 30, 2024, UBS states, under the heading "Conflict of interest—asset-based compensation," that the existence of payments and fees, including those paid from third parties, "creates an incentive for us to recommend that you: . . . Maintain cash balances in a sweep investment."  In the same documents, UBS similarly acknowledges that "***UBS firm-level conflicts*** include incentives to: . . . Maintain a sweep program for uninvested cash balances using our affiliate bank[.]"  As a result of these conflicts of interest, as UBS admits, it had a duty to place its clients' interests ahead of its own with respect to the Cash Sweep Program.

57.    UBS's obligations when setting the interest rates paid to clients in its Cash Sweep Program also included an obligation to take into account "prevailing business and economic conditions."  The UBS Form ADVs for its "retail wrap fee investment advisory programs and Alternative Investments Advisory Program" and "retail and institutional wrap fee and advice-only investment advisory programs," dated March 31, 2023 and March 30, 2024 respectively, for example, describe the process that UBS agreed to follow with respect to the setting of Cash Sweep Program interest rates.  They state that "UBS Bank USA reviews the rates payable to clients on a daily basis in the UBS Deposit Sweeps versus other sweep programs available through broker-dealers *to ensure such rates are aligned with the industry and market*."  The Form ADVs further state that the "rates of interest paid on sweep deposits are determined by a UBS Bank USA interest rate committee that considers *prevailing business and economic conditions*, as well as interest rates paid by competitors' bank sweep deposit programs."  They add that "[t]he committee is comprised of employees of UBS Bank USA *who also undertake activities on behalf of UBS-FS [UBS Financial Services, Inc.] in managing the sweep program*."

58.    The UBS Client Relationship Agreement also incorporates by reference UBS's "Agreements and Disclosures" booklet.  Under a heading for "UBS Bank Sweep Programs Disclosure Statement," the UBS Agreements and Disclosures booklet updated June 2024 provides that UBS "offers three programs to automatically deposit, or 'sweep,' available cash balances not required to pay debits or charges (Free Cash Balances) in a securities account (Securities Account) into a deposit account (Deposit Account) at one or more depository institutions at which deposits are insured by the Federal Deposit Insurance Corporation (FDIC)."  Under the subheading "Bank Sweep Programs Interest Rates," the booklet goes on to state:

> Interest rates will be established periodically based on prevailing business and economic conditions, as well as the nature and scope of your relationship with us.

59.     The 2018 and 2021 iterations of the UBS Agreements and Disclosures booklet contain the same language, under the subheading "Interest Rates."

60.     Similarly, under the subheading, "Summary," the Agreements and Disclosures booklet updated June 2024 states that, "Interest rates paid on balances in your Deposit Accounts at [UBS] Bank USA, AG Stamford Branch and the Program Banks are based upon a variety of factors, including economic and business conditions."

61.     The 2018 and 2021 iterations of the UBS Agreements and Disclosures booklet contain substantially the same language, under the subheading "Interest Rates." Each states that "Interest rates paid on funds in your Deposit Accounts at [UBS] Bank USA and, if applicable, the AG Stamford Branch, are determined by [UBS] Bank USA and the AG Stamford Branch, respectively, in their discretion based upon a variety of factors, including economic and business conditions."

62.     The Agreements and Disclosures booklet dated 2018 and the UBS FDIC-Insured Deposit Program Disclosure Statements dated November 2021, November 2022, and May 16, 2024 also state that "The interest rates on the Deposit Accounts will be determined by *the amount the Banks are willing to pay* on the Deposit Accounts minus the fees paid to UBS and other parties as set forth in Section VIII, 'Information About Your Relationship with UBS and the Bank-Fees to UBS.'" That statement reflects the parties' understanding that the interest rates paid by the Banks in the UBS FDIC-Insured Deposit Program would be determined by a reasonable arm's-length negotiation between UBS and the Banks, including based on the prevailing interest rate environment. It further implies that UBS will obtain a reasonable "fee" and not one that results in unreasonably high payments for itself and "other parties."

63.    UBS breached its express and implied contractual obligations because, among other things, UBS: (i) secured and paid unreasonably low interest to clients with cash balances in the UBS Sweep Programs; (ii) failed to properly take into account "prevailing business and economic conditions" when securing, setting and/or paying the interest rates on such cash sweep accounts; and (iii) consistently appropriated for itself and its affiliates the vast majority of the benefit from clients' cash sweep balances.

### C.    UBS Offered Financial Advice on Swept Cash, Charged an Advisory Fee on Cash Allocations, and Exercised De Facto Control Over Brokerage Client Accounts With Respect to the Cash Sweep Program

64.    UBS's (i) provision of financial advice to clients with respect to the Cash Sweep Program, including advice on swept cash; (ii) complete control over the creation, operation, recommendation and use of the Cash Sweep Program; and (iii) charging of fees on cash allocations reinforce the existence of a fiduciary relationship.

65.    Advisory accounts with deposits in the UBS Cash Sweep Program were charged an advisory fee on their allocated cash. In UBS's Form ADV, dated March 30, 2024, UBS acknowledged under the subheading "Billing on Cash and Cash Equivalents in Your Advisory Accounts; Cash Concentration," that "Cash and cash equivalents in your Advisory Accounts—including ***deposit balances in our UBS Deposit Sweeps*** and money market funds, including the UBS Government Money Market Funds and deposits in the UBS Bank USA Core Savings ***are subject to the Program Fees.***" UBS's Form ADV dated March 31, 2023 contained identical language.

66.    UBS's Form ADV, dated August 18, 2022, contained near-identical language, stating, "Cash and cash equivalents in your Program Accounts—including ***deposit balances in our UBS Deposit Sweeps Programs*** and money market funds, including the UBS Government Money Market Funds ***are subject to the Program Fees***."

67.    It was not until March 31, 2023 that UBS's Form ADV added cautionary language attempting to disclaim its fiduciary duties, stating, "Advisory Programs are not appropriate for clients who want to maintain a high level of cash for extended periods of time.  If you  hold high levels of cash in your Advisory Accounts, then you do so against our recommendation and with the understanding that the value of those investments, securities, deposits or sweep balances will be included for the purposes of calculating the Program Fee, resulting in a higher fee to UBS, our Financial Advisors as well as additional compensation to our affiliates that sponsor or manage such products or use those assets for other business purposes including lending."

68.    The SEC has noted that such activities constitute investment advice, giving rise to fiduciary duties that such disclosures cannot disclaim. In sanctioning Wells Fargo Advisors over similar misconduct, in *In the Matter of Wells Fargo Clearing Servs., LLC, & Wells Fargo Advisors Fin. Network, LLC Respondents*, Release No. 6827 (Jan. 17, 2025), the SEC stated, "While Wells Fargo Advisors ***maintained a duty to provide advice on cash and charged an advisory fee on the cash in advisory accounts***, Wells Fargo Advisors' disclosures were inconsistent and stated in certain materials that 'it does not have any duty to monitor the Cash Sweep Vehicle for your account, or make recommendations about, or make changes to, the Cash Sweep Program that may be beneficial to you.'"

69.    Wells Fargo Advisors' disclosures disclaiming any duty to monitor the cash sweep vehicle for client accounts, or make recommendations about, or changes to its own cash sweep program for its clients' benefit was insufficient to actually disclaim the existence of its fiduciary duties under the Investment Advisers Act. As a result of Wells Fargo Advisors' shirking of its fiduciary duties, the SEC determined that Wells Fargo Advisors had willfully violated the Advisers Act.

70.     Because UBS also provides financial advice to clients with respect to the Cash Sweep Program, controls the creation, operation, recommendation and use of the Cash Sweep Program, and charges an advisory fee on cash allocations on the cash in advisory accounts, UBS also maintains a fiduciary duty to provide advice on cash that its belatedly-added disclosures were insufficient to disclaim.

71.     Even for "non-discretionary" brokerage accounts, UBS had de facto control over its clients' accounts with regards to the Cash Sweep Program because under the terms of the parties' agreement its clients specifically entrusted to UBS the management of the Cash Sweep Program. UBS exercised this de facto control by automatically selecting and placing client funds into the Cash Sweep Program of UBS's choice, by setting the interest rates clients received, choosing which Program Banks client cash was swept to, and determining client eligibility. UBS's exercise of de facto control over client accounts in this manner also suffices to create fiduciary duties owed to such clients.

### D.     UBS Used Its Affiliated Bank, UBS Bank USA, to Siphon Net Interest Income from the Billions of Dollars of Its Clients' Cash Sweep Deposits

72.     In creating and operating its Cash Sweep Program, UBS exercises control over what sweep vehicles it makes available to its clients.  UBS also exercises control over the setting of the interest rates that its affiliated banks, including UBS Bank USA and UBS AG Stamford Branch, pay on its clients' cash balances.

73.     With respect to the UBS FDIC-Insured Deposit Program, UBS sweeps available cash balances in its Cash Sweep Program to specific banks in the UBS "Priority List" (collectively, the "Program Banks").  Banks appear in the Priority List in the order in which UBS opens the deposit accounts for UBS clients, and thus the order in which UBS deposits their funds. Throughout the Class Period, the first bank listed on the Priority List was UBS Bank USA.  This

allowed UBS Bank USA to derive the primary benefit of the spread between income generated and interest amounts paid on the deposits in the UBS Cash Sweep Program.

74.     UBS acted as its clients' agent and custodian in establishing and maintaining the deposit accounts at each bank.  In addition, although the deposit accounts are obligations of the Program Banks, UBS tells its clients in its Agreements and Disclosures document, as it has since at least 2018, that "you will not have a direct relationship with the Banks."  Instead, "all deposits and withdrawals will be made by UBS on your behalf."

75.     As mentioned above, the interest rates paid on clients' cash sweep balances are determined by a UBS Bank USA interest rate committee that is comprised "of employees of UBS Bank USA who also undertake activities on behalf of UBS-FS [UBS Financial Services, Inc.] in managing the sweep program."  UBS thus exercises complete control over the setting and payment of interest to clients in its Cash Sweep Program.

76.     For all clients enrolled in the Deposit Program or Business Program, with the exception of Legacy Accounts, funds in excess of $250,000 are swept to UBS AG Stamford Branch without limit, and UBS derives a benefit from that affiliate relationship.

E.     **UBS Established Unreasonably Low Interest Rates on the Billions of Dollars Its Clients Held in Cash Sweep Accounts**

77.     The interest rates to be paid to clients pursuant to the Cash Sweep Program are established by UBS. Contrary to the terms of UBS's agreements with its clients, UBS has ignored or failed to properly take into account prevailing economic and business conditions in setting rates, resulting in an unfair and unreasonably low rate of interest paid on their clients' swept cash.

78.     For example, and without limitation, since 2022, the Federal Funds Rate—the interest rate at which banks lend to one another—increased significantly from a low of 0.08% to a

high of 5.33% in 2024. However, UBS failed to secure and pay increasing interest rates on its clients' swept cash.

79.     In fact, UBS maintained nearly flat Cash Sweep Program rates for years, at a fraction of a percent, securing high interest returns for itself on the cash but securing far less than a fair and reasonable rate for its clients—thereby retaining the sharply increased spread for itself. This is reflected in the graph below, which compares the Federal Funds Rate to UBS's Cash Sweep Program interest rate on cash deposits up to $249,999:



80.     As this graph illustrates, UBS derives significant profits from having its clients' funds invested in its Cash Sweep Program because UBS establishes rates to be paid to its clients that are neither fair nor reasonable—contrary to UBS's legal, contractual, and implied duties. Moreover, the windfall UBS received in Net Interest Income constituted an excessive fee, reaped directly from its clients' holdings.

81.     UBS's Client Relationship Agreement and Agreements and Disclosures booklet do not specify the applicable interest rates on its cash sweep accounts.  Instead, UBS directs clients to a website to obtain current interest rate information.  Over the past several years, UBS has set artificially low cash sweep rates including as compared to numerous industry benchmarks.  Below is a chart listing examples of the rates paid to the FDIC Program in each of the previous six years and to date in 2024:

| From | To | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| $0 | $249,999 | 0.34% | 0.04% | 0.01% | 0.01% | 0.04% | 0.04% | 0.04% |
| $250,000 | $499,999 | 0.39% | 0.09% | 0.01% | 0.01% | 0.09% | 0.09% | 0.09% |
| $500,000 | $999,999 | 0.44% | 0.09% | 0.01% | 0.01% | 0.09% | 0.09% | 0.09% |
| $1 million | $1,999,999 | 0.74% | 0.19% | 0.01% | 0.01% | 0.39% | 0.39% | 0.39% |
| $2 million | $4,999,999 | 0.94% | 0.19% | 0.01% | 0.01% | 0.49% | 0.49% | 0.49% |
| $ 5 million | and above | 1.04% | 0.24% | 0.02% | 0.02% | 1.04% | 1.04% | 1.04% |

**F.     UBS Has Unjustly Enriched Itself by Paying Unreasonably Low Interest Rates on Its Clients' Bank Sweep Deposits**

82.     UBS has derived significant financial benefits for itself from the payment of unreasonably low interest rates on its clients' cash sweep deposits.  UBS Bank USA and UBS AG Stamford Branch function as highly profitable arbitrage operations of UBS, making it possible for UBS to take advantage of the nearly-cost-free cash entrusted to it by its clients pursuant to the Cash Sweep Program, and retaining for itself, through UBS Bank USA and UBS AG Stamford Branch, the vast majority of the profits generated by its clients' cash deposits.

83.     UBS has continued to take advantage of its clients' cash sweep accounts, even as regulatory and industry scrutiny of cash sweep accounts increased, and competitors raised the interest rates paid on cash sweep balances in late 2023 and throughout 2024.

84.     In November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC.  Then, in July 2024, both Wells Fargo and Morgan Stanley announced that they were raising interest rates on cash sweep accounts.  Morgan Stanley then announced on

August 5, 2024, that the SEC was investigating its "advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."

85.    UBS announced through its parent on August 14, 2024, that it would raise the rates it pays customers on cash sweep deposits in advisory accounts by an unspecified amount, and that these higher rates would be implemented in the middle of the fiscal fourth quarter.

86.    Specifically, UBS Group AG's CFO Todd Tuckner made the following announcement and attempted to downplay the financial impact of the change:

> [T]owards the end of the year, we plan to adjust the sweep deposit rates in our US advisory accounts.  The effect of this change on our NII [Net Interest Income] is expected to be minimal in the fourth quarter.  Moreover, lower U.S. dollar rate assumptions also reduce the modeled impact of sweep deposit rate changes on net interest income in 2025, and likewise would be expected to improve last quarter's guidance of negative 50 million of PBT [Profit Before Tax] annually.

87.    UBS's announced increase of sweep account interest rates—occurring only after intense regulatory scrutiny of the industry and the filing of the present lawsuit—is a tacit admission of UBS's breach of its fiduciary, contractual and implied obligations to its clients.

88.    An article in *AdvisorHub* published on August 14, 2024, commented on UBS's change and emphasized that UBS tried to downplay the financial impact:

> The planned pricing change mirrors adjustments made in recent months by Morgan Stanley, Bank of America's Merrill Lynch and Wells Fargo Advisors, which have all separately reported concerns about regulatory reviews of their cash sweep programs.

> Tuckner downplayed concerns about the impact of the new pricing on UBS's aim to boost its lagging profit margin in the U.S. wealth business into the mid-teens by 2026.  The firm was offsetting the revenue loss with an "array of banking initiatives and expense programs across various categories," Tuckner noted.

89.    The $50 million figure that UBS provided is a net number that UBS said includes offsets from UBS raising rates on other products.  Thus, the gross impact from the interest rate increase is larger than $50 million.  Specifically, financial industry analysts estimate that the

increase in advisory client interest rates alone would have a gross impact of between $150 and $450 million in decreased revenue for UBS each year.

90.    UBS held approximately $36 billion in sweep deposits at the end of its second quarter in 2024, with approximately a third of that in advisory accounts. Consequently, even after UBS's increase, which applies only to advisory accounts, UBS continues to pay the same unreasonably low interest rates on cash sweep accounts totaling approximately ***$24 billion***.

91.    RBC Capital Markets published a report on August 15, 2024, the day after UBS's announced increase in interest rates, titled "UBS Group AG Acceleration of deal benefits offset by lower NII [Net Interest Income]," which stated:

> The largest uncertainty is in the US where UBS commented that the increase in savings rates on sweep deposits (one third out of USD35.7bn) in Q4 2024 will hit PBT [Profit Before Tax] by USD50m pa [per annum]. UBS was not specific on the NII/ revenue hit which will also depend on rates at the time but expects that ***some of the higher interest cost will be offset by other pricing initiatives*** which UBS expects peers will push through as well. UBS does not expect there will be a timing difference between higher rates paid and mitigating actions. These assumptions do appear somewhat optimistic. ***If we assume a 2% savings rate on one third of UBS's sweep deposits, the revenue hit would be close to USD200m***, 1.7% of 2025E group PBT (at 20% marginal costs) which is not material but a meaningful headwind.

92.    Similarly, Morgan Stanley published a report on August 15, 2024, titled "Looking for the trough in GWM [UBS Global Wealth Management] NII," which stated:

> UBS communicated a net $50mn PBT impact coming from higher remuneration of sweep (which UBS plans to implement during Q4) - we estimate the gross impact (vs a $6.2bn 2024 base) could be $150-450mn (with the higher end assuming that UBS goes up to 5% remuneration, as per exhibit on the left), and we assume ~$300mn. . . . [A]s we lack detail on these initiatives, we currently bake in fewer offsetting measures, and a higher than $50mn impact from sweep in 2025.
>
> On $35.7bn of cash sweep, we assume will see repricing, up to a range between 2-5% (assuming a starting point of 0.05% - 1.05% as per UBS's page here): the below table shows sensitivity to different rates levels - we assume 300mn gross impact."

| Rate on sweep - advisory | Gross cost ($mn) | Gross NII impact (2024 base) | Gross PBT impact (2024 base) |
|---|---|---|---|
| 2% | 161 | 2.59% | 3.31% |
| 3% | 268 | 4.32% | 5.51% |
| 4% | 375 | 6.05% | 7.72% |
| 5% | 482 | 7.77% | 9.93% |

93.    Goldman Sachs also published a report on August 15, 2024, titled "UBS Group:

Updating estimates post Q2'24," which stated:

> Regarding sweep deposits, UBS intends to adjust rates in its US advisory accounts by the middle of 4Q24, citing a $50mn consequent annual pre-tax profit headwind, net of offsetting factors. At a Group level, UBS held $36bn in sweep deposits at 2Q24, with ~1/3 of these representing Advisory accounts. This implies c.$12bn in relevant balances at quarter end, broadly in line with our previous estimate, although the CFO has confirmed the balance of sweep deposits has declined slightly over 3Q24 to-date. Given *the $50mn pre-tax impact is a net rather than gross impact*, there has been considerable investor focus on unpacking the constituent parts. *We note that peers have increased rates towards ~2%* — if we were simplistically to assume a 200bp increase on $10bn of balances for UBS, that would imply a *~$200mn funding cost headwind*.

94.    J.P. Morgan published a report on August 15, 2024 that stated:

> Wealth Management NII progression and impact from higher pricing on Sweep deposits has been a key focus of investors recently and the reiteration from UBS of a flat GWM NII progression (JPMe -1%) in 2024 vs. 4Q 23 annualized is a relief in our view. . . . On Sweep deposits, while UBS did not provide a gross impact, it indicated that in the middle of 4Q 24, the bank intends to adjust the sweep deposit rates in US advisory accounts, which, net of offsetting factors, are expected to reduce pre-tax profits by around $50mn annually which is a manageable impact in our view, at less than 1% of Group PBT in 2025E. UBS had $35.7bn of Sweep deposits at the end of 2Q 24 and on the earnings call indicated that advisory i.e. the accounts which are likely to be offered the higher deposit rates is about 1/3rd of these Sweep deposits.

95.    Evercore ISI published a report on August 14, 2024, titled "UBS Looks More Like

MS Than BofA Or Wells On The US Wealth Mgmt Deposit Sweep Topic," which stated:

> We don't want to over or under emphasize this as the regulator might have the final say, but we did breathe a slight sigh of relief early this morning as we read & listened to UBS's 2Q24 earnings print, specifically related to the US Wealth Mgmt deposit sweep issue. In our view, UBS took much more of the MS route and basically said they'll pay something like the same 2% on sweep deposits (didn't

say 2%, but that's our gut) above the $250k minimum as they "price in the value of the insurance." UBS said the rate they pay is expected to be influenced by competitive dynamics affecting the pricing of sweep deposits, bringing them to adjust said pricing by the middle of 4Q24, saying, "we intend to adjust pricing of sweep deposits in our US advisory accounts – which net of offsetting factors, is expected to reduce pretax profits by $50mm annually. . . . [T]he math on the gross impact of repricing implies a higher impact, UBS's plan is to offset the majority of the impact with an array of banking initiatives and expense programs across various categories – meaning we could see that include pricing loans & margin usage higher, modestly higher advisory fees on the whole account (including cash) and/or having the FA [Financial Advisor] share some of the impact through some grid adjustments over time.

96.     In many of these reports, the analysts assume an increase to at least a 2% interest rate paid to advisory clients, and in some cases, an interest rate range of 2% to 5%. These assumptions demonstrate how unreasonably low UBS's rates currently are for its advisory clients, and how unreasonably low they have been, and currently remain (between just 0.05% and 1.05%), for the vast majority of UBS's non-advisory clients.

### G.     UBS Owes Several Independent Duties and Obligations to Its Clients

97.     As a registered investment adviser and broker-dealer acting as an agent for its clients with respect to the Cash Sweep Program, UBS owes fiduciary duties to its clients as well as obligations implied as a matter of law.

98.     First, UBS is a registered investment adviser bound by the fiduciary duties imposed by the Investment Advisers Act of 1940, including duties of care and loyalty. This includes a duty for UBS to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest. Similar duties are imposed on UBS under principles of broker-dealer law and as an agent of its clients in connection with its Bank Sweep Programs.

99.     For all advisory (or managed) accounts (including advisory IRAs), UBS was required to act as a fiduciary to its clients with respect to all aspects of the accounts, including the Cash Sweep Program, pursuant to the Investment Advisers Act of 1940.

100.    For all accounts, UBS agreed to act as "agent" for its clients and exercise "discretion" with respect to the Cash Sweep Program, and, as a result, UBS was required to act as a fiduciary for its clients as its principal with respect to the Cash Sweep Program.

101.    In addition, UBS is bound by the implied covenant of good faith and fair dealing to secure for, and pay to, its clients with sweep accounts a fair and reasonable rate of interest.

102.    UBS contracted with its clients that the interest rate on its Cash Sweep Program deposits would be based on prevailing economic and business conditions.

103.    UBS breached its express and implied contractual duties and fiduciary duties to its clients by, among other things: (i) structuring the Cash Sweep Program to place client assets in the Cash Sweep Program and securing for, and paying to, clients artificially low interest rates so as to benefit UBS and its affiliates to its clients' detriment; (ii) failing to adjust the interest rates paid on sweep account balances to reflect market, industry, or prevailing business and economic conditions as marked by increased interest rates in the industry, including as paid by brokerages with sweep accounts that swept cash to non-affiliated banks; and (iii) failing to properly take into account competitive interest rates when setting sweep account interest rates.

### 1.    UBS Owes Fiduciary Duties to Its Clients

104.    As an investment adviser for its clients, UBS must adhere to certain standards of care and conduct.

105.    Specifically, for its advisory clients, UBS owes its clients a fiduciary duty under the Investment Advisers Act of 1940, which is based on equitable common law principles and fundamental to its relationship with its clients. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 33669,

33669 (July 12, 2019), 17 C.F.R. § 276 ("Under federal law, an investment adviser is a fiduciary.").

106.    Under this fiduciary duty, UBS "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at 33671.

107.    Again, UBS incorporates these duties in its client Agreements and Disclosures document.  For example, under the heading "Our Responsibilities as an Investment Adviser under the Investment Advisers Act," UBS states in the 2018 Agreements and Disclosures document that "When you participate in one of our investment advisory programs, we are considered to have a fiduciary relationship with you under the Investment Advisers Act of 1940."  UBS acknowledges that its "responsibilities include the obligation . . . To act in what we reasonably believe to be your best interests, and in the event of a conflict of interest, place your interests before our own." Though UBS removed this language from later iterations of its Agreements and Disclosures document, the Form ADV contained substantially identical language from at least March 30, 2020 through March 30, 2024.

108.    Because UBS charged an advisory fee on the cash in advisory accounts, it maintained a duty to provide investment advice with respect to the Cash Sweep Programs, as the SEC has found in similar contexts.

109.    UBS owes substantially similar duties to its brokerage clients under broker-dealer rules and regulations, *see* Regulation Best Interest:  The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318 (July 12, 2019), 17 C.F.R. ¶ 240.151-1, which UBS expressly acknowledges and incorporates in its client agreements, including an obligation to "consider reasonable alternatives,

if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

110.    In addition, in creating and operating its Cash Sweep Program, UBS also agreed to act as an agent (and therefore a fiduciary) on behalf of its clients in establishing, maintaining, and operating their cash sweep accounts. For example, pursuant to the UBS Bank Sweep Programs Disclosure Statement updated June 2024 and the UBS FDIC-Insured Deposit Program Disclosure Statement dated May 16, 2024, Defendant UBS acted as its clients' agent and exercised complete control over the establishment and operation of the Cash Bank Sweep Program, including the establishment of rates to be paid to its clients. This included UBS's contractual agreements with clients in the UBS Bank Sweep Programs Disclosure Statement from 2018 to 2024 that:

- "UBS, *as your agent*, will satisfy any debits or charges in your Securities Account by withdrawing funds as set forth in the General Terms and Conditions."

- "UBS will act *as your agent* and custodian in establishing and maintaining the Deposit Accounts at each Bank."

111.    UBS also contractually agreed with clients in the UBS Bank Sweep Programs Disclosure Statement updated June 2024 that:

- "Under the Bank Sweep Programs, *UBS acts as your agent* in establishing Deposit Accounts at [UBS] Bank USA, AG Stamford Branch and the Program Banks and depositing funds into them and withdrawing funds from them."

- "With respect to the Deposit Program, when Free Cash Balances in your Securities Account are first available to be swept to [UBS] Bank USA, UBS, *acting as your agent*, will open a Deposit Account on your behalf at [UBS] Bank USA."

- "When Free Cash Balances in your Securities Account are first available to be swept, UBS, *as your agent*, will establish a Deposit Account for you at [UBS] Bank USA, the first bank on the Priority List."

34

- "When funds are first available for deposit, UBS, *as your agent*, will open an MMDA [money market deposit account] on your behalf at Bank USA and place your funds in the MMDA."

112.    The 2018 and 2021 iterations of the UBS Bank Sweep Programs Disclosure

Statement contain substantially similar agreements, namely that:

- "Under the Bank Sweep Programs, *UBS acts as your agent* in establishing Deposit Accounts at Bank USA and the AG Stamford Branch, and depositing funds into them and withdrawing funds from them."

- "When Free Cash Balances in your Securities Account are first available to be swept to Bank USA (as described in the Agreements and Disclosures booklet), UBS, *acting as your agent*, will open a Business Account on your behalf at [UBS] Bank USA."

- When "Free Cash Balances in your Securities Account are first available to be swept to Bank USA (as described in the Agreements and Disclosures booklet), UBS, *acting as your agent*, will open Deposit Accounts consisting of a transaction account (TA) and a money market deposit account (MMDA) on your behalf at [UBS] Bank USA."

- "*Acting as your agent*, UBS will deposit Free Cash Balances into your Business Account"

- "*Acting as your agent*, UBS will deposit Free Cash Balances into your MMDA."

113.    Moreover, in the Agreements and Disclosures booklet, updated 2018 and 2021,

UBS represented that:

- "UBS may modify or terminate any Bank Sweep Program at any time *in its sole discretion*."

- "UBS may, *in its sole discretion* and without notice, terminate your participation in a Bank Sweep Program at any time."

- "UBS, *in its discretion*, may determine a minimum, or "threshold," amount to be maintained in your [transaction account] to satisfy debits in your Securities Account."

- "All Banks, except Bank USA, will pay UBS a fee equal to a percentage of the average daily deposit balance in your Deposit Accounts at the Bank. The fee may vary from Bank to Bank, and may be as much as 2.5% annually on

some of the Deposit Accounts. ***In its discretion***, UBS may reduce its fee and may vary the amount of the reductions among  clients.”

UBS continued to make those first three representations in the Agreements and Disclosures booklet, updated 2024, but replaced the fourth representation to with the following:

- “All Program Banks will pay Bank USA a fee equal to a percentage of the average daily deposit balance in your Deposit Accounts at the Program Bank. The fee may vary from Program Bank to Program Bank. ***In its discretion***, UBS may reduce its fee and may vary the amount of the reductions among clients.”

The Agreements and Disclosures booklet, updated 2024, additionally represented that:

- “We may change the eligibility requirements for the Bank Sweep Programs at any time ***at our discretion***. In addition, we may grant exceptions to the eligibility requirements for the Bank Sweep Programs ***at our discretion***.”

Defendant’s “discretion” over its Cash Sweep Programs confirms its complete control over those programs and the fiduciary nature of the relationship between Defendant and its clients with respect to their Cash Sweep accounts.

114.    Accordingly, the clients specifically entrusted these duties to UBS, and in its capacity as an adviser, broker, and/or agent in exercising complete control in creating, offering, automatically enrolling, and maintaining cash sweep accounts under the Cash Sweep Program and the rates to be paid thereunder, UBS assumed fiduciary and other duties of loyalty and care to its clients.

115.    Contrary to its duties to its clients, at the same time that UBS was supposed to be acting as its clients’ agent in connection with the Cash Sweep Program, it was actually acting to advance its own interests, and those of its affiliates, at the expense of its clients.  For example, advisory accounts with deposits in the UBS Cash Sweep Program were charged an advisory fee on these cash sweep assets that was greater than the interest paid on the sweep balances.  This resulted in a negative return to the client for assets in the sweep program.

    2.    **UBS Has a Contractual Obligation to Charge No More than Is Reasonable for Its Cash Sweep Program and to Place its Clients' Interests Ahead of Its Own**

116.    For client cash balances maintained in advisory accounts, UBS may utilize those cash balances for investments or loans, but only if it pays to, or secures for, the client a fair and reasonable rate of interest on those cash balances.

117.    UBS's Client Relationship Agreement revised September 2021 and June 2023 promises clients that, with respect to investment advice concerning retirement accounts, UBS must (i) "Not put our financial interests ahead of yours (give loyal advice)"; (ii) "Follow policies and procedures designed to ensure that we give advice that is in your best interest"; and (iii) "***Charge no more than is reasonable*** for our services."

118.    In UBS's Agreements and Disclosures booklet from 2018, UBS also states to clients that when UBS acts as a broker-dealer, UBS has a "duty to deal fairly with you," and "Consistent with our duty of fairness, we are obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that the commissions ***and other fees we charge you are not excessive***." It further provides that when a client participates in a UBS advisory program, UBS's responsibilities include to "act in what we reasonably believe to be your best interests, and ***in the event of a conflict of interest, place your interests before our own***." Though UBS removed this language from later iterations of its Agreements and Disclosures document, the Form ADV contained identical language from at least March 30, 2020 through March 30, 2024. As alleged above, UBS acknowledges that its incentive to recommend that clients maintain cash balances in a sweep investment represents a conflict of interest.

### 3. UBS Has a Legal Obligation to Make Reasonable Arrangements Regarding Its Clients' Cash Balances in Qualified Retirement Accounts

119.    UBS must make "reasonable" arrangements with UBS Bank USA or UBS's other affiliates regarding the Cash Sweep Program in order to comply with Section 4975 of the Internal Revenue Code ("IRC").  IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975(c).

120.    A "disqualified person" includes companies or individuals "providing services to the plan."[2]  26 U.S.C. § 4975(e)(2)(B).  This includes IRA custodians and banks that receive deposits swept from UBS client accounts; in this case, UBS Bank USA, UBS AG Stamford Branch, and other participating banks.

121.    The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4).

122.    Treasury regulations similarly state that when "a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan . . . such authorization must name such bank or similar financial institution and must state that such bank or similar financial institution may make investments in deposits which bear a reasonable rate of interest . . . ."  26 C.F.R. § 54.4975-6(b)(3)(i).

---

[2]  "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)."  26 U.S.C. § 4975(e)(1)(B).

123.    UBS thus has a legal duty to act in the best interests of its clients with respect to its Cash Sweep Program and to pay to or secure for its clients fair and reasonable interest rates on its clients' cash balances.

        **4.**        **UBS Has a Contractual Obligation to Base Its Sweep Account Interest Rates on the Industry, the Market, and Prevailing Business and Economic Conditions**

124.    In UBS's Bank Sweep Programs Disclosure documents distributed to UBS clients, UBS has stated since 2018 that the interest rates paid on its Cash Sweep Program deposits "will be ***established periodically based on prevailing business and economic conditions***, as well as the nature and scope of your relationship with us."

125.    The UBS Form ADV for its "retail wrap fee investment advisory programs and Alternative Investments Advisory Program," dated August 18, 2022, describe the process that UBS agreed to follow with respect to the setting of Cash Sweep Program interest rates. In that disclosure, UBS promised, "Interest rates on the deposit accounts held at UBS Bank USA are determined by UBS Bank USA and are ***competitive relative to similar deposit sweep programs in the industry***. These interest rates depend on the ***general level of interest rates*** in the US economy[.]"

126.    Similarly, the UBS Form ADVs for its "retail wrap fee investment advisory programs and Alternative Investments Advisory Program" and "retail and institutional wrap fee and advice-only investment advisory programs," dated March 31, 2023 and March 30, 2024 respectively, also describe the process that UBS agreed to follow with respect to the setting of Cash Sweep Program interest rates.  They state that "UBS Bank USA reviews the rates payable to clients on a daily basis in the UBS Deposit Sweeps versus other sweep programs available through broker-dealers ***to ensure such rates are aligned with the industry and market***."  The Form ADVs further state that the "rates of interest paid on sweep deposits are determined by a UBS Bank USA

interest rate committee that considers ***prevailing business and economic conditions***, as well as interest rates paid by competitors' bank sweep deposit programs."

127.    Accordingly, pursuant to UBS's agreements with its clients, the interest rates paid to clients in UBS cash sweep accounts throughout the Class Period were required to be competitive relative to similar deposit sweep programs in the industry, depend on the general level of interest rates in the US economy, be aligned with the industry and the market, and reflect prevailing business and economic conditions.

> ### 5.    UBS's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for UBS to Provide Clients with a Reasonable Rate of Interest

128.    UBS's clients' agreements all include an implied covenant of good faith and fair dealing.  This implied covenant includes, but is not limited to, a duty not to perform the parties' agreement based on an ulterior motive and act in a way that evades the spirit of the bargain.  In this case, for instance, that implied covenant included a duty for UBS to consider prevailing business and economic conditions in good faith, such that its clients would obtain a fair and reasonable rate of interest on their cash sweep balances. Even if UBS's clients' agreements authorized UBS to pay its clients a rate of interest that was less than other investments available as sweep options, no language in any of the agreements would have permitted UBS to evade the spirit of the bargain by paying a rate of interest that was so low as to be unreasonable in comparison to business, economic, or competitive conditions.

129.    In failing to secure for or pay to its clients a fair and reasonable rate of interest, UBS breached the implied covenant of good faith and fair dealing.

> ### H.    UBS Breached Its Duties, Contracts and the Implied Covenant, and Profited Thereby

130.    UBS has breached, and continues to breach, its contractual agreements that the interest rates would be based on prevailing business and economic conditions, the corresponding

implied covenant to pay its clients a fair and reasonable rate of interest, and its contractual agreement to not charge excessive fees.

131.    UBS breached, and continues to breach, such obligations by creating and operating its Cash Sweep Program for its own principal benefit, over which UBS exercises complete control, all while failing to pay or secure fair and reasonable rates of interest on client cash balances.

132.    Through its legal and contractual duties, UBS was obligated, but failed, to: (i) set, secure or pay fair and reasonable interest rates on clients' cash balances deposited in the Cash Sweep Program; (ii) properly take into account industry, market or prevailing economic and business conditions in setting interest rates; and (iii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the Cash Sweep Program.

133.    Plaintiffs do ***not*** allege that UBS was necessarily required to offer the highest interest rates available in the market. Plaintiffs also do ***not*** allege that UBS was required to offer rates comparable to money market mutual fund yields. Rather, it was possible for UBS to offer Plaintiffs interest rates on their cash sweep balances that properly or reasonably took into account economic and business conditions, while still offering Plaintiffs rates that were lower than the highest interest rates available elsewhere.

134.    UBS's conduct of failing to pay to or secure for its clients a fair or reasonable rate of interest on their cash balances that properly or reasonably took into account the market and industry, as well as prevailing business and economic conditions, unjustly enriches UBS and its affiliates at the expense of its clients.

135.    UBS and its affiliates gained significant financial benefits from the cash balances swept into its Cash Sweep Program through the spread the affiliate banks earn on the Cash Sweep Program deposits, the fees UBS received from the Program Banks, and other incentive

arrangements with the affiliate banks that are based, at least in part, on clients' deposit balances and number of accounts in the Cash Sweep Program.

136.    UBS's Net Interest Income increased dramatically from 2021 to 2023 due, in part, to UBS breaching its duties to its clients, appropriating to itself the benefit of the rising interest rate environment, and failing to pass on such benefit to its clients for whom it acted as an agent and fiduciary.

137.    The relationships between UBS and its clients, the imbalance of negotiating power between UBS and its clients, and UBS's exercise of control over the interest paid in the Cash Sweep Program are circumstances that create an equitable obligation (in addition to any fiduciary, contractual or implied duty) running from UBS to its clients.

138.    UBS's continual sweep of Plaintiffs' and the other Class members' cash into the Cash Sweep Program, while paying them unreasonably low interest rates, constitutes a continuing wrong and was an ongoing and continuing series of breaches of UBS's duties to, and contracts with, Plaintiffs and the other Class members.

### I.    UBS Secured and Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits

139.    UBS established, implemented, and maintains the Cash Sweep Program to maximize its profits through increased Net Interest Income by securing for its clients unfair and unreasonably low interest rates from its affiliates UBS Bank USA and UBS AG Stamford Branch, while appropriating almost all of the interest earned at significantly higher rates for itself.

140.    IRS regulations define an "arm's-length interest rate" as:

[A] rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 C.F.R. § 1.482-2(a)(2).

141.    In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, 34648 (June 10, 2003).

142.    Under these terms, and any reasonable understanding of what a reasonable rate of interest is, UBS did not secure for or pay to its clients, including Plaintiffs and Class members, a reasonable rate of interest on their cash sweep accounts.  Nor did UBS base its sweep account interest rates on competitive rates, the market, industry, or prevailing economic and business conditions.

### 1.    Sweep Account Rates Paid by Other Institutions

143.    The interest rates paid by other brokerages that sweep cash demonstrate that the interest rates paid by UBS to its cash sweep accountholders were not fair or reasonable, nor that UBS properly took into account the market, industry, or prevailing economic and business conditions.  This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, such as Fidelity.

144.    As shown in the graph below, an index of interest rates paid by five brokerages that did ***not*** sweep client cash balances to a bank affiliated with its own brokerage more closely tracks the movement of the Federal Funds Rate (set forth above) than UBS's *de minimis* cash sweep rates. By contrast, the interest rate that UBS paid its clients was much lower during much of the relevant time:



145.    As shown in the above graph, from late 2018 to 2024, UBS sweep rates had minimal movement, even as the sweep rates paid by brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than UBS in the beginning of 2020.  In addition, starting in mid-2022, UBS's sweep rate stayed consistently low with miniscule increases while the rates paid by brokerages that swept cash to unaffiliated banks increased significantly.

146.    Specific firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected the prevailing market, industry, economic and business conditions, compared to the rates paid by UBS.

147.    For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than UBS.  At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million).  UBS, in contrast, paid 0.04% for cash balances up to $249,999 as of year-end

2022.  As mentioned above, Class members' cash balances in the Cash Sweep Program were primarily allocated to UBS Bank USA and UBS AG Stamford Branch.

148.    Additional examples of brokerage firms that sweep their clients' cash into accounts with banks that are not affiliated with the firm include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

149.    Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid 2.03% interest (on cash balances up to $1 million).  In comparison, in the same time period, UBS paid only 0.05% APY on cash balances up to $249,999.

150.    In addition, the interest rate offered by Vanguard on its sweep program was 3.60% regardless of asset tier as of August 6, 2024, and the interest rate offered by Dreyfus was 2.55% regardless of asset tier as of September 13, 2024.

151.    A comparison of UBS's sweep account interest rates to an industry-wide analysis of 300 sweep programs also shows that UBS's rates were unreasonably low, and that UBS did not base its sweep interest rates on the market, industry, or "prevailing business and economic conditions."  This graph compares UBS's rate that it pays on accounts up to $249,999 (orange line) to the average rate that other sweep programs nationwide have paid on the lowest tier of deposits (blue line).



152.    The rates depicted by the blue line above are ***conservatively low*** comparators because: (i) they represent the averages across many brokerages, some paying reasonable rates, and some not; (ii) other comparators are more appropriate, including when one compares UBS to brokerages that sweep to unaffiliated banks (as set forth above); (iii) UBS promised to take into account prevailing economic conditions, which includes the Federal Funds Rate, and the Treasury yield, and which was much more favorable than UBS's sweep rates offered; and (iv) fact and expert discovery will examine and address the appropriate comparators, UBS's interest rate methodology, and what experts opine was the reasonable rate.

153.    But, as these data show, other brokerage and advisory financial institutions that have cash sweep programs pay significantly higher rates than UBS did for its own clients.

## 2.    The Federal Funds Rate Benchmark

154.    A number of interest rate benchmarks increased significantly over the past several years, but UBS's rates barely changed (in its asset tiers up to $249,999) or changed by only miniscule amounts (in its higher asset tiers).

155.    The Federal Funds Rate benchmark further demonstrates that the interest rate paid to UBS Cash Sweep Program accountholders was not reasonable and did not properly take into account the market, industry, or prevailing economic and business conditions.  The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

156.    The Federal Funds Rate increased significantly in recent years.  For example, the effective Federal Funds Rate on August 28, 2024, was 5.33%.  The graph below (the same as reproduced above) shows the Federal Funds Rate over the past several years and the rate paid on the Bank Sweep Programs on deposits up to $249,999.  As the comparison shows, the interest rates paid to UBS cash sweep account holders have been drastically lower and have failed to reflect changes in the market:

47



157.    The above graph demonstrates that the interest rates UBS secured for its clients' sweep accounts were unreasonably low, when considered in light of prevailing business and economic conditions.

### 3.    The Interest Rates on Sovereign Short-Term Debt Benchmark

158.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rates paid on UBS cash sweep accounts were not reasonable and did not properly take into account the market, industry, or prevailing business and economic conditions.  U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks.  They are sold at a discount to their face value, and when they mature, the investor is paid the face value.  Treasury Bills are considered extremely safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

159.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below,

over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



160.    During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rate UBS paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 4.    The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements

161.    The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than UBS's cash sweep account interest rates.  This further demonstrates that the interest rates paid on UBS cash sweep accounts were not reasonable and did not properly take into account the prevailing business and economic conditions.

162.    A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

163.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the cash sweep interest rates offered by UBS.

## CLASS ACTION ALLEGATIONS

164.    Plaintiffs re-allege and incorporate by reference the allegations set forth above. Plaintiffs seek certification of the following Class:

> **Clients of UBS who had cash deposits or balances in UBS's Cash Sweep Program from August 23, 2018 until the unlawful conduct alleged herein ceases.**

165.    Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that such definition should be narrowed, expanded, or otherwise modified.

166.    Excluded from the Class are UBS and any of its affiliates, legal representatives, employees, or officers.

167.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

168.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time. However, UBS's wealth management program provides financial planning and advisory services to thousands of client accounts through the work of over 6,000 financial advisors.  Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23.  Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of**
**Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

169.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.   These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    whether UBS's interest rates paid on its sweep accounts were fair and reasonable;

b.    whether in setting interest rates to be paid in its sweep accounts UBS reasonably or properly accounted for industry, market or prevailing economic and business conditions;

c.    whether UBS owed fiduciary duties and other duties of care to the Class, and whether UBS violated those duties;

d.    whether UBS acted as its clients' agent in its management and complete control over the Cash Sweep Program;

e.    whether UBS breached the contractual terms of its account agreements and other written communications to Class members;

f.    whether UBS breached the implied covenant of good faith and fair dealing;

g.    whether UBS was unjustly enriched by its wrongful conduct;

h.    whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

i.     whether and to what extent Class members are entitled to damages and other monetary relief; and

j.     whether and to what extent Class members are entitled to attorneys' fees and costs.

170.    UBS client agreements contain a choice of law provision that provides, in relevant part, that they and their enforcement shall be governed by the laws of New York.

171.    The UBS client agreements also expressly incorporate the rules of applicable federal, state and self-regulatory organizations, including the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). Specifically, they provide:

> We are subject to the Securities Exchange Act of 1934, the Securities Act of 1933, the rules of the SEC, the rules of self-regulatory organizations such as the Financial Industry Regulatory Authority (FINRA), the rules of the New York Stock Exchange and other exchanges and applicable state laws.

**Typicality**
**Rule 23(a)(3)**

172.    Plaintiffs' claims are typical of the claims of the Class because they were account holders with UBS that were paid unreasonably low interest rates in their cash sweep accounts that did not take into account prevailing economic, market, and business conditions, and were not competitive interest rates. Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from the same course of conduct by Defendant, and the relief sought within the Class is common to the Class members.

**Adequacy of Representation**
**Rule 23(a)(4)**

173.    Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and

Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

**Superiority**
**Rule 23(b)(3)**

174.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

175.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

176.    Superiority is particularly satisfied here, where the law of a single state will apply. Under the uniform contract terms with UBS, the law of New York will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

177.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

178.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against Defendant UBS.

179.    Defendant's governing documents related to the Cash Sweep Program constitute a binding agreement between Defendant and their accountholders.   For example, the UBS Agreements and Disclosures define "UBS," "we," "us," and "ours" as referring to UBS.

180.    The governing documents provide that Defendant will pay to, or secure for, its clients a rate of interest on cash deposits or balances maintained in the Cash Sweep Program that properly takes into account market, industry, or prevailing business and economic conditions, and that Defendant will not charge excessive fees.

181.    UBS promised that when it acts as a broker-dealer, it has a "duty to deal fairly with" clients, and consistent with that duty, UBS was obligated to ensure that the "fees we [UBS] charges you [clients] are not excessive." With respect to advisory clients, UBS also has a contractual obligation to "charge no more than is reasonable" for its advisory and cash sweep services and to "place your [clients'] interests before our [UBS's] own"

182.    As set forth herein, Defendant failed to pay to, or secure for, Plaintiffs and Class members an interest rate on their Cash Sweep Program holdings that accounted for market, industry, or prevailing business and economic conditions and Defendant thereby breached the

54

contracts. Defendant also charged excessive fees by reaping excessive net interest income from its clients' cash balances and underpaying interest to them, charged a more than reasonable rate for its advisory services over the cash sweep balances, and failed to place its clients' interests before its own, by creating and operating its cash sweep program for UBS's own benefit, and reaping exorbitant net interest income from clients' cash balances while underpaying interest to them.

183.    Defendant's past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Class.

<u>SECOND CLAIM FOR RELIEF</u>
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

184.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against Defendant UBS.

185.    Defendant's governing documents related to its accounts constitute a binding agreement with those accountholders.

186.    Implicit in these contracts (all of which incorporated Defendant's Cash Sweep Program disclosure documents), and under New York law which governs them, is a covenant of good faith and fair dealing, requiring Defendant to deal fairly with its clients, to fulfill its obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain.

187.    Through the implied covenant of good faith and fair dealing, Defendant was obligated to pay to, or secure for, Class members a fair and reasonable rate of interest on their cash balances; including by reasonably or properly accounting for current or prevailing business and economic conditions and competitive interest rates when paying or securing interest rates on their clients' cash sweep balances.  By failing to do so, Defendant breached the implied covenant of good faith and fair dealing.

188.    Defendant's past, continuous, and ongoing breaches of the implied covenant damaged and continue to damage Plaintiffs and the Class.

**THIRD CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**

189.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against Defendant UBS.

190.    Defendant UBS owed fiduciary duties to Plaintiffs and Class members with respect to the Cash Sweep Programs.

191.    These duties include, but are not limited to:

    a.    a duty of care;

    b.    a duty of loyalty;

    c.    a duty to act in the best interests of its clients; and

    d.    a duty not to place UBS's interests above those of its clients.

192.    UBS breached the foregoing duties when it (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest that properly took into account prevailing business and economic conditions; (ii) failed to act in the best interests of Plaintiffs and the Class with respect to the Bank Sweep Programs; and (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Cash Sweep Programs.

193.    UBS's past, continuous, and ongoing breaches of duties damaged Plaintiffs and the Class.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

194.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against Defendant UBS in the alternative to the preceding Claims to the extent it is duplicative of any such claim.

195.    As a result of UBS's wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

196.    As a result of UBS's wrongful conduct, UBS was unjustly enriched because, among other benefits, it received significantly greater Net Interest Income than it would have but for its wrongful conduct.

197.    UBS appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

198.    It would be inequitable and unjust for UBS to retain these wrongfully obtained profits.

199.    UBS's retention of these unjustly obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class demand judgment and relief as follows:

      a.    certifying the proposed Class, and appointing Plaintiffs and their counsel to represent the proposed Class;

      b.    awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

      c.    awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

      d.        awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

      e.        awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

DATED: February 28, 2025

By: */s/ John Rizio-Hamilton*
Salvatore J. Graziano
John Rizio-Hamilton
Avi Josefson
Adam H. Wierzbowski
Michael D. Blatchley
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

Michael Dell'Angelo (admitted *pro hac vice*)
Alex B. Heller (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aheller@bm.net

Matthew L. Dameron
Clinton J. Mann (admitted *pro hac vice*)
Claire M. Terrebonne (admitted *pro hac vice*)
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7110
Facsimile: (816) 945-7118
matt@williamsdirks.com

cmann@williamsdirks.com
cterrebonne@williamsdirks.com

***Court-Appointed Interim Co-Lead Counsel for
Plaintiffs and the Proposed Class***

Alan L. Rosca (admitted *pro hac vice*)
Jonathan A. Korte (admitted *pro hac vice*)
**ROSCA SCARLATO LLC**
2000 Auburn Dr. Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
arosca@rscounsel.law
jkorte@rscounsel.law

Paul J. Scarlato (admitted *pro hac vice*)
**ROSCA SCARLATO LLC**
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

Michael J. Angelides (*pro hac vice motion
forthcoming*)
Thomas I. Sheridan, III
Sona R. Shah
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404
mangelides@simmonsfirm.com
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

Robert J. Jackson, Jr.
**BUZIN LAW, P.C.**
3003 Purchase Street
P.O. Box 529
Purchase, New York 10577
Tel: (212) 879-8100
robert.j.jackson@nyu.edu
***Additional Counsel for Plaintiffs***