USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                    :
KELLY GOLDSMITH, *individually and on behalf of all* :
*others similarly situated, et al.*,                                :
                                                                    :            1:24-cv-6354-GHW
                                              Plaintiffs,    :
                                                                    :        MEMORANDUM OPINION &
                           -v -                                     :                ORDER
                                                                    :
UBS FINANCIAL SERVICES INC.,                                       :
                                                                    :
                                              Defendant.    :
------------------------------------------------------------------ X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiffs Kelly Goldsmith and Andrew Davitt have advisory accounts at Defendant UBS

Financial Services Inc. ("UBS").  Both Plaintiffs elected to enroll in UBS's "Cash Sweep Program,"

under which any uninvested cash balances in their investment accounts at UBS were automatically

"swept" to interest-bearing deposit accounts (the "Deposit Accounts").  UBS set the interest rates

for deposit accounts at the UBS-affiliated banks to which their cash was swept.

Plaintiffs acknowledge that UBS had some discretion in setting interest rates for their

deposits at UBS-affiliated banks.  But, Plaintiffs allege, UBS was contractually obligated to consider,

among other factors, "prevailing business and economic conditions" when setting interest rates; yet

it failed to do so.  Despite this obligation, the interest rates for UBS-affiliated banks in its Cash

Sweep Program remained static over the years—set at a mere fraction of a percent—and failed to

increase in response to prevailing market conditions.  As a result, Plaintiffs filed this action,

asserting, on behalf of a putative class, that UBS breached the terms of each of the contracts

between Plaintiffs and UBS, breached the implied covenant of good faith and fair dealing, violated

its fiduciary duties to its advisory clients, and in so doing, was unjustly enriched.

Before determining whether UBS breached any affirmative contractual covenants, the Court

must resolve an important threshold question:  what documents actually comprise the contract between each of the plaintiffs and UBS?  No party disputes that the contracts include each Plaintiffs' respective "Client Relationship Agreement" ("CRA"), which explicitly references and incorporates UBS's "Agreements and Disclosures Booklet" ("A&Ds"), and a document titled "Conducting Business with UBS."  The parties do, however, dispute whether the contracts governing their dispute also include UBS's "Form ADV Disclosures"—mandatory, regulatory disclosures which UBS is required to compile and make available as an "investment adviser" pursuant to the Investment Advisers Act of 1940.

Significantly, in each CRA, UBS chose to define the "Agreement" between it and each of its customers expansively to include "the Client Relationship Agreement, together *with all other agreements and disclosures that we make available to you*, and any amendments."  Because of the breadth of each CRA's definition of "Agreement," the contract between each Plaintiff and UBS incorporates all disclosures "made available" to Plaintiffs—including UBS's mandatory regulatory disclosures, the Form ADV Disclosures.[1]

Because the A&Ds include an affirmative covenant obligating UBS to "establish[] [interest rates] based on prevailing business and economic conditions" when exercising its discretion to set interest rates for UBS-affiliated banks in the Cash Sweep Program, Plaintiffs have plausibly pleaded their claim for breach of contract.  But because Plaintiffs' unjust enrichment claim is duplicative of their claim for breach of contract, that claim must be dismissed.  Accordingly, for the reasons that follow, UBS's motion to dismiss is GRANTED in part and DENIED in part.

---

[1] As used herein, "Agreement" means each Plaintiff's contract with UBS, which includes:  (1) each Plaintiff's respective CRA; (2) the A&Ds published during the time period in which each Plaintiff maintained an account with UBS; and (3) the versions of the Form ADVs made available during the time period in which each Plaintiff maintained an account with UBS.

## II.    BACKGROUND[2]

### A.  Facts

#### i.  Parties

Plaintiff Andrew Davitt is a citizen of Pennsylvania.  CAC ¶ 12.  In 2015 and 2019, Mr. Davitt opened brokerage and retirement accounts with UBS, which UBS manages on an advisory basis.  *Id.*  Mr. Davitt alleges that cash balances in both his advisory accounts and retirement account were automatically "swept" into interest-bearing bank accounts at UBS-affiliated banks pursuant to the Cash Sweep Program.  *Id.*

Plaintiff Kelly Goldsmith is a citizen of South Carolina.  *Id.* ¶ 13.  From 2013 until 2023 when she closed her accounts, Ms. Goldsmith maintained brokerage accounts with UBS for which UBS was designated as an "Investment Adviser" and which it managed on an advisory basis.  *Id.* Since approximately 2021, the cash balances in Ms. Goldsmith's advisory accounts were "swept" into interest-bearing bank accounts at UBS-affiliated banks pursuant to the Cash Sweep Program. *Id.*

Defendant UBS is a financial services company incorporated in Delaware with its principal place of business in New York, New York.  *Id.* ¶ 14.  UBS is a broker-dealer and "investment adviser registered with the SEC."  *Id.*  UBS offers a variety of financial services and products to its clients, including the option to participate in its Cash Sweep Program.  *Id.*

---

[2] The facts are taken from the Consolidated Amended Complaint, Dkt. No. 48 ("CAC"), and are accepted as true for the purposes of this motion.  *See, e.g.*, *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### ii.  UBS's Cash Sweep Program

Among the financial services and products that UBS offers to its clients is the option to participate in UBS's "Cash Sweep Program."  For UBS clients who elect to participate in the Cash Sweep Program, any uninvested cash balances in their UBS accounts are automatically "swept" to Deposit Accounts that then generate returns for the client.  *Id.* ¶ 2.  Participation in the Cash Sweep Program is voluntary; UBS clients are not obligated to participate.  Instead, UBS clients can choose to invest any cash in their UBS accounts or to hold uninvested cash elsewhere.  *See id.*  The interest rates to be paid to clients for cash swept to a UBS-affiliated bank under the Cash Sweep Program are established by UBS.  *Id.* ¶ 77.  Specifically, "interest rates paid on clients' cash sweep balances are determined by a UBS Bank USA interest rate committee that is comprised of employees of UBS Bank USA who also undertake activities on behalf of . . . [UBS Financial Services, Inc.] in managing the sweep program."  *Id.* ¶ 75 (internal quotations omitted).

Plaintiffs allege that "UBS maintained nearly flat Cash Sweep Program rates for years, at a fraction of a percent," *id.* ¶ 79, and that "the vast majority of UBS clients with cash sweep accounts have only been paid interest rates of .01% to .5%," *id.* ¶ 7.  During this time, the rates set by UBS for its affiliate banks remained untethered to relevant market benchmarks.  *Id.* ¶ 83.  And the rates were also untethered to client-specific factors—Plaintiffs allege that the interest rate differed only marginally, if at all, across client asset tiers, *id.* ¶ 81, and that the interest rate was the same within each tier, irrespective of which bank held the Deposit Accounts, *id.* ¶ 46.  As a result, Plaintiffs allege that UBS's affiliates "function as highly profitable arbitrage operations of UBS, making it possible for UBS to take advantage of the nearly-cost-free cash entrusted to it by its clients . . . and retaining for itself . . . the vast majority of the profits generated by its clients' cash deposits."  *Id.* ¶ 82.

"UBS offers two cash sweep programs to its clients:  (i) the UBS Bank Sweep Program and (ii) the UBS FDIC-Insured Program ('FDIC Program')" the former of which has "three further

subdivisions:  (i) the UBS Deposit Account Sweep Program ('Deposit Program'), (ii) the UBS Insured Sweep Program ('UBS-ISP'), and (iii) the UBS Business Account Sweep Program ('Business Program')."  *Id.* ¶ 40.  Which specific program a UBS client is enrolled in should they elect to participate in the Cash Sweep Program depends on client-specific eligibility factors.[3]  *Id.* ¶¶ 40–45.

When a client elects to enroll in a Cash Sweep Program, UBS, on behalf of that client, establishes a Deposit Account at one of its listed "Program Banks."  *Id.* ¶ 47.  When cash is swept from a client's UBS account to a Deposit Account at a Program Bank, UBS receives a fee from the Program Bank.  *Id.* ¶ 30.  While cash is theoretically swept to both UBS affiliated and UBS unaffiliated Program Banks, Plaintiffs allege that the "vast majority" of swept cash "is deposited with UBS's affiliate, UBS Bank USA."  *Id.* ¶ 46.  This is because regardless of which specific sweep program a UBS client is enrolled in, UBS Bank USA is either "the first bank listed on the priority list," *id.*, or "UBS affiliated banks are the *only* bank options" listed, *id.* ¶ 49 (emphasis in original).  And any cash is swept to a particular Program Bank in accordance with the order in which that bank appears on that "Priority List."  *Id.* ¶ 46.

For UBS clients enrolled in either the UBS-ISP or the FDIC Program, the first bank on the Priority List is UBS's affiliate bank, UBS Bank USA.  *Id.* ¶ 48.  "Once the client's funds in the Deposit Account at UBS Bank USA reach $249,000 (or $498,000 for Joint Accounts of two or more individuals), UBS, again acting as the client's 'agent' will 'open a Deposit Account for [the client] at the next Program Bank on the Priority List and place [the] additional funds in that Program Bank.'"

---

[3] The FDIC Program "is the sweep program available to revocable and irrevocable trusts, as long as none of the beneficiaries is a for-profit business entity."  CAC ¶ 41.  The Deposit Program "is the sweep program available to retirement advisory accounts, individual participant accounts . . . and Legacy Accounts (i.e., those enrolled in the Deposit Program prior to November 18, 2019)."  *Id.* ¶ 42.  "The UBS-ISP is the cash sweep program available to individuals, business entities, nonprofit organizations, revocable or irrevocable owned by U.S. residents, . . . all trusts owned by non-U.S. residents, custodial accounts, . . . Legacy Accounts . . . that choose to opt in, individual retirement accounts, employee benefit plans, and retirement accounts owned or trusteed by a business."  *Id.* ¶ 43.  "The Business Program is available only to Legacy Business Accounts . . . and individual participant accounts under a defined contribution plan that are managed on a discretionary basis."  *Id.* ¶ 44.

*Id.* ¶ 47.  But because most UBS-ISP or FDIC clients' accounts do not exceed the individual or joint threshold, "the vast majority" of cash "is deposited with the first bank on each priority list:  UBS's affiliate bank, UBS Bank USA."  *Id.* ¶ 48.  And for clients enrolled "in the Deposit Program or the Business Program, . . . UBS affiliated banks are the only bank options."  *Id.* ¶ 48 (emphasis omitted).  As a result, Plaintiffs allege that "UBS has derived significant financial benefits . . . from the payment of unreasonably low interest rates."  *Id.* ¶ 82.

### iii.   The Plaintiffs' Respective Agreements with UBS

UBS establishes the terms of, and the parties' rights and obligations pursuant to, the Cash Sweep Program through a series of documents which collectively comprise Plaintiffs' respective Agreements with UBS.  Upon opening an account with UBS, each Plaintiff signed a CRA.  *Id.* ¶ 18.  When a client executes a CRA, UBS provides the client with a copy of the current version of its A&Ds[4] and, in Plaintiffs' cases, a copy of the document titled "Conducting Business with UBS."[5]  Because Plaintiffs maintained advisory accounts at UBS, they also received UBS's Form ADV Disclosures upon first opening their UBS accounts.  *Id.* ¶ 31.  Collectively, these documents comprise the Agreement between each of the Plaintiffs and UBS.[6]

### 1.   Plaintiffs' CRAs[7]

Mr. Davitt executed a CRA with UBS on January 19, 2015.  CAC ¶ 19; Dkt. No. 57-2 ("Davitt Signature Page"); Dkt. No. 57-3 ("Davitt CRA").  Ms. Goldsmith executed a "Master Account Agreement"[8] with UBS on March 23, 2007, *id.* ¶ 22; Dkt No. 57-4, and subsequently

---

[4] No party disputes that the A&Ds are part of each of the Plaintiffs' Agreements.  Rather, the parties agree that the A&Ds are expressly referenced by and incorporated into each Agreement by each CRA.

[5] Defendant asserts, and Plaintiffs do not dispute, that "Plaintiffs also received [this] disclosure guide," "Conducting Business with UBS" upon executing their respective CRAs.  Dkt. No. 56 ("Mem.") at 4.

[6] The parties dispute whether UBS's Form ADVs are incorporated by reference into each Agreement.  The Court addresses the substance of the parties' dispute with respect to what documents comprise the entire Agreement below.

[7] Because both CRAs are—with some minor, non-dispositive exceptions—largely substantively and textually identical, the Court discusses Plaintiffs' CRAs collectively.  Accordingly, unless otherwise indicated, Plaintiffs' respective CRAs use the same language.

[8] The document UBS now calls the "CRA" was formerly called the "Master Account Agreement."

entered into a CRA with UBS in February 2013.  *Id.* ¶ 22; Dkt No. 57-5 ("Goldsmith CRA").

Plaintiffs' respective CRAs "outline[] the terms and conditions of [Plaintiffs'] relationship[s] with [UBS]."  Davitt CRA at 5; Goldsmith CRA at 5.  Each CRA "applies to all of your Accounts at UBS, including any Accounts you may already have with [UBS] and Accounts you may open in the future."  Davitt CRA at 5; Goldsmith CRA at 5.  "The terms and conditions in th[e] Client Relationship Agreement[s] apply to all Accounts you open with UBS."  Davitt CRA at 5; Goldsmith CRA at 5.  Each CRA also provides that—

> The accounts and services [UBS] offer[s] may change over time.  [UBS] may change our Agreement with you at any time by sending you a written notice of the change, and the changes will be effective on the date of the notice. . . .  [UBS] may cease to offer services at any time without prior notice.  Your continued use of your Account constitutes your acceptance of the new terms and conditions.

Davitt CRA at 17; Goldsmith CRA at 15.

Importantly, Plaintiffs' CRAs broadly define their respective "Agreement[s]" with UBS as "the Client Relationship Agreement, together *with all other agreements and disclosures that we make available to you,* and any amendments."[9]  Davitt CRA at 5 (emphasis added).  Each CRA also provides that UBS will "send you other agreements and disclosures for the services you choose when you open this account, as well as features you may add in the future.  We refer to all these documents, including any amendments, as the Agreements and Disclosures booklet."  *Id.*[10]  And under the heading "Entire Agreement and Changes to the Agreement," UBS includes an integration clause which states that "[t]his Client Relationship Agreement *and the related documents*, including the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire 'Agreement.'"  Davitt CRA at 17; Goldsmith CRA at 15 (emphasis added).

---

[9] *Compare* Goldsmith CRA at 5 (defining "Agreement" as "the Client Relationship Agreement, together with all other agreements and disclosures that we make available to you, *including* any amendments." (emphasis added)).

[10] *Compare* Goldsmith CRA at 5 (UBS will "send you other agreements and disclosures for the *UBS accounts and* services you choose when you open *your* account, as well as features you may add in the future.  We refer to all these documents, including any amendments, as the Agreements and Disclosures booklet." (emphasis added)).

7

Under the heading "Our Sweep Options[11] and Your Sweep Election," Plaintiffs' CRAs state that UBS "offer[s] options for the automatic investment or deposit of available cash balances."[12] Davitt CRA at 7. UBS discloses that it "may change or discontinue [its] sweep service at any time, including changing the terms and conditions of the sweep service."[13] *Id.* at 8. Each CRA directs UBS clients to "refer to the UBS Bank Sweep Programs Disclosure [within the A&Ds] for important information about how the UBS Bank Sweep Programs work."[14] *Id.*

### 2. The A&Ds[15]

Upon executing their respective CRAs, Plaintiffs were to each receive a copy of the then-current version of the A&Ds. Davitt CRA at 5; Goldsmith CRA at 5. No party disputes that the A&Ds, and any amendments to the A&Ds, are explicitly referenced by the CRA and incorporated by that reference into the Agreement between Plaintiffs and UBS. Davitt CRA at 5; Goldsmith CRA at 5. Both Plaintiffs were subject to the 2018 and 2021 versions of the A&Ds because they maintained accounts at UBS during that period. However, because Ms. Goldsmith closed her UBS accounts in 2023, CAC ¶ 13, only Mr. Davitt was subject to the 2024 update to the A&Ds. The A&Ds impose affirmative contractual obligations on UBS with respect to the Cash Sweep Program with which, Plaintiffs allege, UBS failed to comply.

In particular, Plaintiffs allege that the 2018 A&Ds provide that when UBS acts as a broker-

---

[11] *Compare* Goldsmith CRA at 7("Our Sweep *Program* and Your Sweep Election" (emphasis added)).

[12] *Compare* Goldsmith CRA at 7(UBS "offer[s] options for the [] investment or deposit of *uninvested* cash balances (emphasis added)).

[13] *Compare* Goldsmith CRA at 7 ("We may change or discontinue the sweep *feature or specific sweep options . . . from time to time*." (emphasis added)).

[14] *Compare* Goldsmith CRA at 8 ("Please refer to the UBS Deposit Account Sweep Program Disclosure *and the UBS International Deposit Account Sweep Program Disclosure in the Agreements and Disclosures booklet*." (emphasis added)).

[15] Both Plaintiffs' CRAs expressly incorporate any updates to the A&Ds into the parties' Agreements. Davitt CRA at 17; Goldsmith CRA at 15. Accordingly, Plaintiffs were subject to the same terms under the A&Ds from 2015 to 2023, the period of overlap for their respective claims against UBS. *See generally* Davitt Signature Page. Plaintiffs allege that UBS most recently updated the A&Ds in June 2024, CAC ¶ 25. Although Defendant appended the April 18, 2025 update to the A&Ds in support of its motion to dismiss, Dkt. No. 57-1, neither party has appended the 2018, 2021, or 2024 versions to any of their filings. Accordingly, the Court accepts as true Plaintiffs' factual allegations as to what those documents state because the Court may not consider the 2025 amendment—which is neither integral to nor incorporated into Plaintiffs' CAC, as discussed herein.

dealer, it "has a duty 'to deal fairly with you,'" and that "'[c]onsistent with [UBS's] duty of fairness, [it] is obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that the commissions and other fees [it] charge[s] you are not excessive.'" *Id.* ¶ 26 (quoting 2018 A&Ds). And, Plaintiffs allege, the 2018 A&Ds state that "when a client participates in a UBS advisory program, UBS's responsibilities include to 'act in what we reasonably believe to be your best interests, and in the event of a conflict of interest, place your interests before our own.'" *Id.* (quoting 2018 A&Ds). And the 2018 A&Ds allegedly state that "'[w]hen you participate in one of our investment advisory programs, we are considered to have a fiduciary relationship with you under the Investment Advisers Act of 1940.'" *Id.* ¶ 29 (quoting 2018 A&Ds). Additionally, "the 2018 [A&Ds], which the relevant CRAs themselves expressly incorporated, stated":

> At the beginning of our advisory relationship, *we will give you our Form ADV brochure*, which provides detailed information about, among other things, the program(s) you select; the advisory services we provide; our fees, personnel, other business activities and financial industry affiliations; and conflicts between our interests and your interests.

*Id.* ¶ 31 (emphasis added) (internal quotation omitted).

Plaintiffs allege that in the 2018, in the 2021, and again in the 2024 A&Ds "UBS promised that . . . '[i]nterest rates will be established periodically based on prevailing business and economic conditions, as well as the nature and scope of your relationship with us.'" *Id.* ¶ 27 (quoting 2018, 2021 & 2024 A&Ds). Similarly, the 2018, 2021, and 2024 A&Ds state that "'[i]nterest rates paid on funds in your Deposit Accounts at [UBS] Bank USA and, if applicable, the AG Stamford Branch, are determined by [UBS] Bank USA and the AG Stamford Branch, respectively, in their discretion based upon a variety of factors, including economic and business conditions.'"[16] *Id.* ¶ 28 (quoting

---

[16] As alleged, the 2024 A&Ds includes substantially similar language—"Interest rates paid on balances in your Deposit Accounts at [UBS] Bank USA . . . are based upon a variety of factors, including economic and business conditions." CAC ¶ 28.

2018, 2021 & 2024 A&Ds) (alterations in original).  And in all three versions of the A&Ds applicable to this case, UBS, using slightly different language, stated that it retained "sole discretion" or "discretion" to modify or discontinue, the Cash Sweep Program in whole or part.  *Id.* ¶ 30 ("UBS may modify or terminate either Bank Sweep Program at any time in its sole discretion." (emphasis omitted)).

### 3.  "Conducting Business with UBS"

UBS provided the document titled "Conducting Business with UBS," Dkt. No. 57-6, to Plaintiffs upon execution of their respective CRAs.  The "document is intended to inform [UBS clients] about the key distinctions between brokerage and investment advisory services and [UBS's] respective duties and obligations" as to each service.  *Id.* at 3.  In the document, UBS states that "in [its] capacity as an investment adviser, [it] offer[s] a number of investment advisory programs," and that "when [it] act[s] as your investment adviser, [it] generally will enter into a written agreement with you expressly acknowledging our investment advisory relationship with you and describing our relationships to you."  *Id.*  And UBS makes clear that at the beginning of every advisory relationship, it "will give [the advisory client] [UBS's] Form ADV brochure."  *Id.*

This document also describes UBS's "Fiduciary Responsibilities as an Investment Adviser." *Id.*  UBS is "considered to have a fiduciary relationship with [its investment advisory clients,] under the Investment Advisers Act of 1940 *and applicable state law.*"  *Id.* (emphasis added).  This relationship gives rise to certain "obligations," including the obligation to:  disclose "all material conflicts" arising between UBS's and a client's interests; to treat advisory clients "fairly and equitably"; and "[t]o act in what we reasonably believe to be [its client's] best interests, and in the event of a conflict of interest, place [the client's] interests before [its] own."  *Id.*

### 4.  UBS's Form ADV Disclosures

Because Plaintiffs are advisory account holders, UBS was also to provide Plaintiffs with its

10

then-current Form ADV Disclosures when Plaintiffs opened their accounts. CAC ¶ 31 ("At the beginning of our advisory relationship, *we will give you our Form ADV brochure*" (emphasis added)); Dkt. No. 57-6 (same). The Form ADV Disclosures are mandatory regulatory disclosures that UBS, as an investment adviser within the meaning of the Investment Adviser's Act of 1940. Pursuant to its obligations under the Investment Adviser's Act of 1940, UBS regularly updates its Form ADVs and makes the documents publicly available on its website, including during the course of the parties' relationships. Plaintiffs allege that as advisory clients, UBS's Form ADVs were incorporated by reference into the Agreement. And Plaintiffs allege that provisions of the Form ADVs contain contractual covenants that impose additional obligations on UBS in administering its Cash Sweep Program and in acting as a fiduciary for its advisory clients.

In particular, Plaintiffs point to UBS's Form ADV[17] dated August 18, 2022, which describes UBS's obligations and duties as an "Investment Adviser" within the meaning of the Investment Adviser's Act of 1940. Dkt No. 59-1 at 6–7 ("Our Responsibilities as an Investment Adviser"). The 2022 Form ADV states that, "[w]hen UBS acts as a broker-dealer," "[UBS] ha[s] a duty to deal fairly with you." *Id.* at 8. "Consistent with [that] duty of fairness, [UBS] [is] obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that commissions and other fees we charge you are not excessive." *Id.* The 2022 ADV Disclosure also states that "[i]nterest rates on the deposit accounts held at UBS Bank USA are determined by UBS Bank USA and are competitive relative to similar deposit sweep programs in the industry." *Id.* at 48. It also states that "[t]hese interest rates depend on the general level of interest rates in the US economy and generally are lower than the prevailing yield on money market mutual funds and other cash alternatives and can be significantly lower." *Id.*

---

[17] This document provides that it "applies to all of your retail wrap fee program advisory accounts and the Alternative Investments Advisory Program at UBS . . . including any advisory accounts you may open in the future." Dkt. No. 59-1 at 1.

The March 30, 2024 ADV similarly states that "UBS Bank USA reviews the rates payable to clients on a daily basis in the UBS Deposit Sweeps versus other sweep programs available through broker dealers to ensure such rates are aligned with the industry and market." Dkt. No. 59-2 at 50. "These rates of interest paid on sweep deposits are determined by a UBS Bank USA interest rate committee that considers prevailing business and economic conditions, as well as interest rates paid by competitors' bank deposit sweep programs."[18] *Id.*

### B. Procedural History

Ms. Goldsmith filed this action on August 22, 2024, asserting claims against UBS for breach of fiduciary duty and unjust enrichment, on behalf of a putative class of "[r]etail clients of UBS who had cash deposits or balances in UBS's Sweep Programs." Dkt. No. 1 ¶¶ 64, 75–87. On September 3, 2024, Mr. Davitt filed his initial complaint, also asserting claims against UBS for breach of fiduciary duty and unjust enrichment, as well as claims for gross negligence and violations of New York General Business Law § 349, on behalf of a putative class of "persons who held cash positions in accounts custodied by Defendant and whose cash was subject to Defendant's [Cash Sweep] Program." Dkt. No. 1 ¶¶ 43, 54–89, *Davitt v. UBS Fin. Servs. Inc.*, No. 24-cv-6692.

At the same time he filed his complaint, Mr. Davitt also filed a statement of relatedness, in which he identified that his case may be related to Ms. Goldsmith's earlier filed action because his complaint "alleges substantially similar facts against the same defendant, with overlapping causes of action." Dkt. No. 4, *Davitt v. UBS Fin. Servs. Inc.*, No. 24-cv-6692. The next day, the Court accepted Mr. Davitt's case as related to Ms. Goldsmith's.

On October 7, 2024, Mr. Davitt and Ms. Goldsmith filed a motion requesting that the Court consolidate their respective cases and appoint lead counsel. *See generally* Dkt. No. 20; Dkt. No. 21;

---

[18] Plaintiffs allege that UBS's Form ADV dated March 31, 2023 contains identical language. CAC ¶ 33. Because the parties did not append that document to their briefing, the Court accepts this fact as pleaded.

12

Dkt No. 22.  By letter dated October 22, 2024, Defendant indicated that it did not substantively oppose Plaintiffs' consolidation request, but that "efficiency and cost considerations counsel toward the appointment of just one firm, as interim class counsel," rather than the three firms Plaintiffs had proposed.  Dkt. No. 24.  On November 1, 2024, Magistrate Judge Gabriel W. Gorenstein, to whom the case was referred, granted Plaintiffs' motion to consolidate Plaintiffs' cases and appointed interim class counsel in the consolidated action.  Dkt. No. 29.

On December 3, 2024, Plaintiffs filed a consolidated complaint against UBS.  Dkt. No. 34. On February 7, 2025, UBS moved to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting many of the same arguments it now raises in the motion to dismiss currently pending before the Court.  *See generally* Dkt. No. 44; Dkt. No. 45; Dkt. No. 46.  In lieu of opposing Defendant's motion to dismiss, Plaintiffs filed an amended complaint—the operative CAC—on February 28, 2025.  *See generally* CAC.  In their CAC, Plaintiffs assert a series of claims based on UBS's alleged failure to set interest rates in line with its obligations pursuant to the Agreements between Plaintiffs and UBS governing the Cash Sweep Program.  *See id.*  Plaintiffs' CAC asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment on behalf of a putative class.  *See id.*

On April 18, 2025, UBS moved to dismiss the CAC pursuant to Federal Rule of Civil Procedure 12(b)(6), *see generally* Mem., and in support of its motion, filed some of the underlying documents comprising Plaintiffs' respective Agreements with UBS, Dkt. No. 57-1; Dkt. No. 57-2; Davitt CRA; Goldsmith CRA; Dkt. No. 57-6; Dkt. No. 57-7; Dkt. No. 57-8.  On June 6, 2025, Plaintiffs filed their opposition, Dkt. No. 58 ("Opp'n").  In support of their motion, Plaintiffs filed UBS's Form ADVs dated August 18, 2022, Dkt. No. 59-1 ("2022 ADV"), and March 30, 2024, Dkt. No. 59-2 ("2024 ADV").  Defendant replied on July 7, 2025, reiterating many of the same arguments it asserted in its motion to dismiss.  Dkt. No. 61 ("Reply").  Since the date on which

Defendant's motion was fully briefed, the parties have filed a number of notices of supplemental authority, notifying the Court of other district courts' decisions with respect to similar cash sweep programs offered by other financial institutions. *See generally* Dkt Nos. 60–74.

## III.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of N.Y Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court may also consider documents that are "integral to" the complaint, meaning that the complaint relies heavily upon its terms and effects. *Id.*  "[E]ven if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (quoting *Faulkner*, 463 F.3d at 134).

Here, in addition to the well-pleaded facts in the complaint, the Court has also considered each of Plaintiffs' respective CRAs, and UBS's Form ADVs dated August 18, 2022 and March 30, 2024,[19] which, as described below, comprise part of Plaintiffs' respective Agreements with UBS. The CRAs and UBS's Form ADVs are integral to the CAC because the CAC cites to specific language from these documents and "relies heavily" upon the documents' terms and effects.  And no party disputes the accuracy or authenticity of these documents.

However, the Court has not considered the April 18, 2025 update to the A&Ds because it is neither integral to nor incorporated into the CAC. *See generally* Dkt. No. 57-1.  The April 18, 2025 update to the A&Ds is neither integral to, nor incorporated into, Plaintiffs' CAC because that update

---

[19] The Court has not considered UBS's Form ADV dated March 31, 2023 because it was not provided to the Court. However, as noted above, *see supra* note 18, Plaintiffs allege that the 2023 Form ADV is identical to the 2024 version. The Court accepts these facts as pleaded.

15

post-dates the filing of the CAC on February 28, 2025—Plaintiffs' claims cannot be premised on a document not yet in existence at the time of the complaint's filing. *See generally* CAC. Nor can a complaint reference a document that does not yet exist. No complete prior version of the A&Ds was presented to the Court in connection with Defendant's motion to dismiss. Accordingly, with respect to the A&Ds, the Court's opinion relies exclusively on Plaintiffs' allegations as to what the prior versions of the A&Ds stated.

## IV.  DISCUSSION

### A.  Plaintiffs Have Plausibly Pleaded a Breach of Contract

The Agreements are governed by New York Law. Davitt CRA at 17 ("This Agreement . . . and its enforcement, are governed by the laws of the State of New York."); Goldsmith CRA at 15 (same). Under New York law, to state a claim for breach of contract "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)). "When interpreting a contract, our 'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (ellipsis omitted) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted). "Whether or not a writing is ambiguous is a question of law to be

16

resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . ").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 864 F.3d at 99 (2d Cir. 2017) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114). "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract

17

must be considered as a whole.").  But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."  *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)).  Rather, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal quotation marks omitted).

On a motion to dismiss, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."  *Orchard Hill*, 830 F.3d at 156; *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim.").  In other words, courts are not "obliged to accept the allegations of the complaint as to how to construe a contract," but they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss."  *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

Here, the parties dispute what documents are part of each Plaintiffs' Agreement with UBS.  And the parties dispute the third element of a breach of contract claim under New York law—whether Defendant breached each Agreement.

### i.  The Parties' Respective Agreements with UBS

At the outset, the Court must address a threshold question:  what documents comprise Plaintiffs' respective Agreements with UBS.  No party disputes that Plaintiffs' Agreements include the CRAs that they "receive[d] and execute[d] when they open[ed] their UBS [] account(s)."  Mem at

1 ("The terms of the Sweep Program are contained in a Client Relationship Agreement); CAC ¶ 18 ("As Defendant UBS acknowledges, 'The terms of the Sweep Program are contained . . . .'"). Nor does any party dispute that the A&Ds, and any subsequent amendments thereto, are also included in Plaintiffs' Agreements because the A&Ds are "expressly referenced and incorporated in the CRA." Mem. at 1 (acknowledging that the A&Ds form part of the parties' Agreement); CAC ¶ 18 (same). Nor does any party dispute that the document titled "Conducting Business with UBS," which "Plaintiffs also received" upon executing their CRAs is incorporated into each Agreement. Mem. at 4; CAC ¶ 18. The parties do, however, dispute whether UBS's "Form ADV Disclosures" are also incorporated by reference into each Plaintiff's Agreement. Plaintiffs contend that the Form ADVs are incorporated by reference pursuant to the broad incorporation language in Plaintiffs' respective CRAs. And Defendant contends that the Form ADVs, "the filing of which is mandated by federal law [pursuant to the Investment Adviser's Act of 1940] . . . stand separate from the parties' agreements." Mem. at 13.

Because of the breadth of both the CRAs' definition of "Agreement," and because the CRAs' integration clause does not impose any limitations on that breadth, the contract between each Plaintiff and UBS incorporates all documents UBS "make[s] available" to Plaintiffs—including the Form ADV Disclosures. "Parties to a contract are plainly free to incorporate by reference, and bind themselves . . . to, terms that may be found in other agreements." *Ronan Assocs., Inc. v. Loc. 94-94A-94B, Int'l Union of Operating Eng'rs, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994). "To determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard." *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018), *aff'd*, 774 F. App'x 714 (2d Cir. 2019).

UBS's Form ADVs are incorporated by reference into Plaintiff's respective Agreements

pursuant to their CRAs' plain language.  UBS chose define "Agreement" in each CRA in an exceedingly broad manner that expressly incorporated all documents disclosed by UBS to its clients. Plaintiffs' respective CRAs define "Agreement" as "the Client Relationship Agreement, together *with all other agreements and disclosures that we make available to you*, and any amendments."[20]  Davitt CRA at 5 (emphasis added).  The CRAs also provide that UBS will "send you other agreements and disclosures for the services you choose when you open this account, as well as features you may add in the future.  We refer to all these documents, including any amendments, as the Agreements and Disclosures booklet."  *Id.*[21]

And although both CRAs include an integration clause, the integration clauses do not narrow, or otherwise limit, the CRAs' definition of Agreement as including "*all other agreements and disclosures that we make available to you*, and any amendments."  *See* Davitt CRA at 5 (emphasis added); Goldsmith CRA at 5.  Rather, the integration clause in Plaintiffs' respective CRAs is consistent with the CRA's definition of "Agreement" because the integration clause incorporates all "related documents."  Under the heading "Entire Agreement and Changes to the Agreement," the integration clause provides that "[t]his [CRA] *and the related documents*, including the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire 'Agreement.'"  Davitt CRA at 17; Goldsmith CRA at 15 (emphasis added).  The documents that UBS chose to define as part of its "Agreement" fall neatly within the broad group of "related documents" that the integration clause incorporates.

Under a plain reading of the CRAs' broad definition of "Agreement," UBS's Form ADV disclosures are incorporated into Plaintiffs' Agreements because the Form ADVs were, in fact,

---

[20] *Compare* Goldsmith CRA at 5 (defining "Agreement" as "the Client Relationship Agreement, together with all other agreements and disclosures that we make available to you, *including* any amendments.").

[21] *Compare* Goldsmith CRA at 5 (UBS will "send you other agreements and disclosures for the UBS accounts and services you choose when you open your account, as well as features you may add in the future.  We refer to all these documents, including any amendments, as the Agreements and Disclosures booklet.").

"ma[d]e available" to Plaintiffs.  The 2018 A&Ds—which UBS agrees are incorporated by reference into Plaintiffs' respective Agreements—clearly state that UBS's Form ADVs are given to its advisory clients like Plaintiffs.  Plaintiffs allege that the 2018 A&Ds provide that—

> At the beginning of our advisory relationship, *we will give you our Form ADV brochure*, which provides detailed information about, among other things, the program(s) you select; the advisory services we provide; our fees, personnel, other business activities and financial industry affiliations; and conflicts between our interests and your interests.

CAC ¶ 31 (emphasis added).  UBS concedes that because Plaintiffs maintained advisory accounts with UBS, Plaintiffs received copies of the Form ADVs upon opening their accounts.  Mem. at 5 ("Investment advisory clients also receive disclosures, including Form ADV brochures.").[22] Accordingly, the Form ADVs are "ma[d]e available" to Plaintiffs within the plain meaning of that clause upon opening their advisory accounts with UBS.[23]  And UBS "make[s] available" the Form ADVs not just at the outset of a relationship with its advisory clients, but also throughout the duration of the relationship.  UBS's Form ADVs are, as UBS itself concedes, mandatory regulatory disclosures; they are "made available" publicly through UBS's website.

And the integration clause does not exclude the Form ADVs.  As part of UBS's "Agreement" with its customers, together with each CRA, the Form ADVs are "related documents" that fit within the scope of the CRAs integration clause.  The Form ADV disclosures, which provide additional information as to Plaintiffs' advisory accounts and the UBS's Cash Sweep Program are also substantively "related" to Plaintiffs' CRAs, which more generally outline the terms of both services.  Davitt CRA at 17; Goldsmith CRA at 15.  Because UBS expressly incorporated all

---

[22] *See also* Dkt. No. 57-7 (letter dated April 28, 2010 to Ms. Goldsmith which states "[o]n behalf of UBS Financial Services Inc., . . . [see] the Form ADV Disclosures Brochures.").

[23] The Court will not rewrite the parties' Agreements to reach a different conclusion.  UBS describes itself as "one of the nation's leading securities firms" and is represented by competent counsel.  Dkt. No. 59-1 at 6.  If UBS did not wish to include the Form ADV disclosures in the parties' Agreements, it could have drafted language more narrowly to exclude those documents.  It did not choose to do so.  Instead, UBS drafted the broad language found in its CRA, perhaps in an effort to provide itself unilateral discretion to modify the terms of its Agreement with its clients.  Whatever motivated UBS's choice of language, it cannot disclaim the language's effect when it does not work to UBS's benefit.

21

documents made available to its clients as part of its "Agreement" with them, UBS's Form ADV

disclosures are incorporated into Plaintiffs' respective Agreements.

### ii. Promise to Base Rates on Prevailing Market, Business, and Economic Conditions

Because Plaintiffs have plausibly alleged that UBS was contractually obligated to, yet failed to

"base[] interest rates on prevailing business and economic conditions," they have stated a breach of

contract claim.  Plaintiffs' respective Agreements provide that "Interest rates will be established

periodically based on prevailing business and economic conditions, as well as the nature and scope

of your relationship with us."  CAC ¶ 27 (citing 2018, 2021 & 2024 A&Ds).[24]  Accordingly, the plain

language of each Agreement included an affirmative contractual covenant[25] obligating UBS to base

---

[24] This affirmative covenant is included in the 2018, 2021, and 2024 A&Ds, which all parties agree are part of Plaintiffs' respective Agreements.

[25] Plaintiffs contend that UBS breached additional contractual covenants requiring that it also base interest rates on prevailing "economic and business conditions" including—

- "Interest rates paid on funds in your Deposit Account at [UBS] Bank-USA, and if applicable, the AG Stamford Branch, are determined by [UBS] Bank USA, and the AG Stamford Branch, in their discretion based upon a variety of factors, including economic and business conditions." CAC ¶ 28 (citing 2018, 2021 & 2024 A&Ds).
- "UBS Bank USA reviews the rates payable to clients on a daily basis in the UBS Deposit Sweeps versus other sweep programs available through broker-dealers to ensure such rates are aligned with the industry and market." *Id.* ¶ 33 (citing 2023 & 2024 ADVs); *see also* 2024 ADV at 50.
- "These rates of interest paid on sweep deposits are determined by a UBS Bank USA Interest rate committee that considers prevailing business and economic conditions, as well as interest rates paid by competitors' bank sweep deposit programs." CAC ¶ 33 (citing 2023 & 2024 A&Ds); *see also* 2024 ADV at 50.

Because all of these statements include the present-tense verb "are," they could be properly read as representations or warranties and not as affirmative covenants.  "Representations, warranties, and contractual covenants are distinct concepts." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 625 (S.D.N.Y. 2024).  A representation, customarily, is "a presentation of fact—either by words or by conduct—made to induce someone to act, esp. to enter into a contract." *Representation*, Black's Law Dictionary (12th ed. 2024); *Spencer-Smith*, 347 F.R.D. at 625 (quoting 13 Williston on Contracts § 38:20 (4th ed. 2024) ("A representation is a statement that induces the formation of the contract as distinguished from an affirmation of fact or a promise that is incorporated in and material to the contract.")).  "The falsity of a representation in a contract may give rise to a claim for rescission or for fraud or for other remedies specifically identified in the agreement." 27 Williston on Contracts § 69:47–49 (4th ed. 2024)).

"A warranty may have a different meaning depending on the context . . . [a]nd is typically a way of guaranteeing that something is or will be true." *Spencer-Smith*, 347 F.R.D. at 625 (internal citations omitted).  "When used . . . as part of a representation and warranty clause, it may be 'an assurance by one party to a contract of the existence of a fact upon which the other party may rely amounting to a promise to indemnify the promisee for any loss if the fact warranted proves untrue,'" or [it may be] 'an express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties; esp., a seller's promise that the thing being sold is as represented or promised.'" *Id.* (quoting *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.), then quoting *Warranty*, Black's Law Dictionary (11th ed. 2019)).  "Breach of a warranty can give rise to claims for damages or recission." *Id.* (collecting cases).

interest rates "periodically," partly on "prevailing business and economic conditions."

Each Agreement's language requiring that UBS base interest rates on "prevailing business and economic conditions" is an enforceable contractual covenant. First, even though each Agreement afforded Defendant discretion to set rates, that does not obviate Defendant's obligation to, in exercising that discretion, based the interest rates on "prevailing business and economic conditions" as required pursuant to each Agreement. CAC ¶ 27; *see also Mehlman v. Ameriprise Fin., Inc.*, No. CV 24-3018, 2025 WL 2403252, at *7 (D. Minn. Aug. 19, 2025) ("[W]hile it is true that the Brokerage Contract discloses that interest rates and interest income will vary and fluctuate based on prevailing economic and business conditions, those disclosures do not obviate any alleged contractual obligation Ameriprise had to secure for and pay clients rates of interest that considered prevailing economic and business conditions.").

The parties do not dispute that UBS had some discretionary authority when setting interest rates. CAC ¶ 28 ("Interest rates paid on funds in your Deposit Accounts . . . are determined by [UBS] Bank USA and the AG Stamford Branch, respectively, *in their discretion* based upon a variety of factors, including economic and business conditions." (emphasis added) (quoting 2018, 2021 & 2024 A&Ds)). But each Agreement's language obligating UBS to consider "prevailing business and economic conditions," "limit[s] [the] discretionary authority to set rates. A viable contract claim exists when a contract provides for discretion, but the defendant allegedly exceeded the contractual

---

By contrast, a contractual covenant is "a formal agreement or promise, usu. in a contract or deed, to do or not do a particular act; a compact or stipulation." *Covenant*, Black's Law Dictionary (12th ed. 2024). "Violation of a covenant can give rise to a claim for damages and, if material, may relieve the non-breaching party of the duty to perform." *Spencer-Smith*, 347 F.R.D. at 625 (collecting cases). Because no party raised the issue nor argued that any such distinction is material to Plaintiffs' claims for breach of each Agreement, the Court will not resolve it *sua sponte*. Accordingly, for purposes of this opinion, the Court treats these statements as future obligations, as the parties have assumed in their briefing, rather than present statements of fact but does not so hold. And because determining whether UBS breached the assumed covenants contained in these statements requires the Court to look to the same factual allegations made with respect to Plaintiffs' claim for the breach of the obligation to base rates on "prevailing business and economic conditions," Plaintiffs have plausibly pleaded UBS breached any such assumed covenants for the same reasons articulated in this section of the Court's opinion.

bounds of that discretion." *In re JPMorgan Chase Cash Sweep Program*, No. 24 CIV. 6404, 2026 WL 396055, at *7 (S.D.N.Y. Feb. 12, 2026) (citation omitted).  "It makes no difference that the contract states that [the defendant] has discretion to set rates, because the contract also states that the rates 'will vary based on business and economic conditions.'" *Id.*  Indeed, "both things can be true"—UBS was contractually afforded discretion in setting rates and the rates as set "were unreasonable when considering prevailing economic and business conditions."  *Mehlman*, 2025 WL 2403252, at *7.

Second and relatedly, Plaintiffs plausibly allege a breach premised, not on the failure to set interest rates at any particular level, but rather, on UBS's alleged failure to account for "prevailing business and economic conditions" when setting the rates.  *Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 713 (S.D.N.Y. 2025) ("Liberty does not contend that Oppenheimer failed to pay the rates that it disclosed.  Liberty's claim, instead, is that the interest rates that Oppenheimer disclosed (and paid) were inconsistent with Oppenheimer's promise to pay interest rates that would 'vary based upon prevailing economic and business conditions.'").  UBS argues that Plaintiffs have not adequately pleaded a breach because it "disclosed (and Plaintiffs agreed) that rates paid on Deposit Accounts may be 'lower than the interest rates available . . . on deposit accounts offered by other depository institutions," and 'may [also] . . . be lower than the prevailing yield on money market mutual funds or other investments available as sweep options.'"  Mem. at 9 (quoting Dkt. No. 57-1 at 99, 115).  UBS's argument is not persuasive.

At the outset, the Court notes that Defendant bases its argument on language that is not before the Court[26]—the Court has not considered the April 18, 2025 A&Ds, Dkt. No. 57-1, in

---

[26] The Court notes that similar language appears in UBS's Form ADVs, but Defendant did not cite to or point to this document to make a similar argument based on their text, presumably because UBS asserts the Form ADVs are not incorporated into the Agreements.  As UBS is not a *pro se* litigant, the Court need not raise and respond to a potential argument that it did not present to the Court.

connection with Defendant's motion to dismiss,[27] and no complete prior version of the A&Ds was presented to the Court. And the language Defendant identifies is neither quoted nor cited in Plaintiffs' CAC. *See generally* CAC. That said, even if the Court were to assume that the disclosure language does appear in the A&Ds, UBS's argument misstates Plaintiffs' breach claim because Plaintiffs are not arguing that UBS's chosen rate was objectively low under some purported provision of the Agreements requiring interest to be set at any particular level. As Plaintiffs correctly contend, nothing in the parties' Agreements prohibits UBS from "setting rates lower than other available rates." Opp'n at 11. Rather, "UBS could have set [] rates based on prevailing economic and business conditions that were not necessarily the highest in the industry and thereby [still] met its contractual obligations." *Id.*

And Plaintiffs have plausibly alleged facts to support the conclusion that UBS breached each Agreement by failing to base interest rates on "prevailing business and economic conditions," because Plaintiffs have shown that multiple market indicia varied while UBS's rates remained static. To support their argument that UBS breached its obligation, Plaintiffs identify a number market benchmarks, including Federal Fund rates, U.S. Treasury Bills, and repurchase agreements, CAC ¶¶ 154–63, as among the "prevailing business and economic conditions" that UBS allegedly failed to consider. Plaintiffs allege that although these benchmarks varied over the years, UBS's interest rates remained comparatively both static and unreasonably low.

Specifically, Plaintiffs allege that the "Federal Funds Rate benchmark [] demonstrates that the interest rate paid to UBS Cash Sweep Program accountholders . . . did not properly take into account the market, industry, or prevailing economic and business conditions," *id.* ¶ 155–56, because

---

[27] As discussed *supra*, the 2025 A&Ds are neither integral to nor incorporated into the CAC. *See generally* Dkt. No. 57-1. The April 18, 2025 update to the A&Ds is neither integral to, nor incorporated into, Plaintiffs' CAC because that update post-dates the filing of the CAC on February 28, 2025—Plaintiffs' claims cannot be premised on nor reference a document not yet in existence at the time of the complaint's filing. *See generally* CAC.

even though the Federal Fund Rate varied (and increased) significantly in recent years, UBS's interest rates did not track those increases, *id.* ¶¶ 157. And, Plaintiffs allege, from 2018 through 2024, sweep rates from comparator brokerages tracked the movement of the Federal Fund Rate in contrast to UBS's static interest rates. CAC ¶¶ 143–63 ("A comparison of UBS's sweep account interest rates to an industry-wide analysis of 300 sweep programs also shows that UBS's rates were unreasonably low, and that UBS did not base its sweep interest rates on the market, industry, or 'prevailing business and economic conditions.'"). These allegations plausibly support Plaintiffs' claim that UBS failed to account for prevailing business and economic condition because these market indicia varied while UBS's rates remained constant.

The benchmarks need not be perfect comparators, rather, to support Plaintiffs' claims such benchmarks need only be among the "prevailing business and market conditions" which UBS was contractually obligated to consider when setting its sweep rates. Opp'n at 11 (noting that Plaintiffs do identify more direct comparators as well by citing an industry-wide analysis of 300 sweep programs). On a motion to dismiss, such factual allegations plausibly support Plaintiffs' claim that UBS failed to account for prevailing market, business, or economic conditions in setting rates. *Wood v. Prudential Ret. Ins.*, No. 3:15-CV-1785, 2016 WL 5940946, at *4 (D. Conn. Sept. 19, 2016) (declining to determine, on a motion to dismiss, whether similar market benchmarks were among the market factors the defendant was obligated to consider in setting interest rates because any such determination is fact specific).

And Plaintiffs have also plausibly alleged facts to support the conclusion that UBS breached the Agreements because UBS's interest rates were untethered from the other factors it was contractually permitted to consider, namely—"the scope of your relationship with us." Plaintiffs allege facts to support the conclusion that UBS's interest rates were not based on the particulars of its relationship with any given client because the rates were similar across all asset tiers. CAC ¶ 81

26

(alleging that in the lowest asset tier, UBS's rates over the past four years ranged between only .01% to .04%, and for clients with as much as $999,999 in cash, UBS paid only .01% to .09% over that same time period).  Because UBS's interest rates did not increase correspondingly with either market benchmarks or with client-specific factors, Plaintiffs have plausibly alleged that UBS breached each Agreement.  *See Dey v. Robinhood Mkts., Inc.*, 780 F. Supp. 3d 882, 893 (N.D. Cal. 2025) (concluding, on a misrepresentation claim, that the factual "allegations plausibly support an inference that the interest rates paid to customers are not, in fact, determined by external market conditions but, instead, are more directly affected by Robinhood's choice to increase the amount of fees it extracts for itself").  In sum, Plaintiffs have stated a breach of contract claim against UBS with respect to the obligation that "[i]nterest rates will be established periodically based on prevailing business and economic conditions, as well as the scope of your relationship with us."  CAC ¶ 27; 2024 A&Ds at 50.

### iii.  Promise to Pay "Competitive" Rates[28]

Plaintiffs have also plausibly stated a breach of contract claim based on the theory that UBS promised its cash sweep clients a "competitive" rate of interest.  The Agreements state that: "Interest rates on the deposit accounts held at UBS Bank USA are determined by UBS Bank USA and are competitive relative to similar deposit sweep programs in the industry."  2022 ADV at 48; CAC ¶ 34.  The Agreements also state that:  "These rates of interest paid on sweep deposits are determined by a UBS Bank USA Interest rate committee that considers prevailing business and economic conditions, as well as the interest rates paid by the competitors' bank sweep deposit programs."  2024 ADV at 50; CAC ¶ 33 (citing 2023 & 2024 ADVs).  Because UBS allegedly failed to set interest rates that were "competitive [] to similar deposit sweep programs," 2022 ADV at 48,

---

[28] For purposes of this opinion, the Court treats the statements discussed in this section as covenants imposing future obligations rather than present statements of fact but does not so hold.  The Court notes however that the statements discussed in this section also all use the present-tense verb "are."  *See supra* note 25.

27

and failed to consider rates paid by "competitors' bank deposit sweep programs" when setting its interest rates, Plaintiffs have plausibly stated a breach of contract claim on this ground, 2024 ADV at 50.

Plaintiffs have alleged facts to support the conclusion that UBS's interest rates were not "competitive" to interest rates offered through other cash sweep programs and that UBS failed to consider its competitors' interest rates. Specifically, Plaintiffs point to an industry-wide analysis comparing interest rates across 300 sweep programs, which, they assert, demonstrates that UBS failed to account for its competitors' interest rates or to set "competitive" rates. CAC ¶ 151. Plaintiffs allege that this data "shows that UBS's rates were unreasonably low" and shows that "other brokerage and advisory financial institutions that have cash sweep programs pay significantly higher rates than UBS did." CAC ¶¶ 150–53. Such factual allegations, accepted as true, render Plaintiffs' claims that UBS failed to consider its competitors' rates plausible. *In re Wells Fargo Cash Sweep Litig.*, No. 24-CV-04616-VC, 2025 WL 1785315, at *2 (N.D. Cal. June 27, 2025) (concluding that a breach of contract claim was plausibly pleaded where the complaint "alleges that five comparable firms that swept cash into unaffiliated banks paid substantially higher rates . . . [and] also cites an industry-wide analysis of 300 cash sweep programs"). Accordingly, Plaintiffs have stated their breach of contract claim because they have plausibly alleged that Defendant failed to set "competitive" interest rates as required under the terms of the Agreements.

UBS raises several arguments as to why Plaintiffs cannot base their breach claim on a promise to pay "competitive rates." None are persuasive. First, UBS contends that any such a purported promise cannot form the basis for Plaintiffs' breach of contract claim because the ADV documents are "non-contractual disclosures." Mem. at 12. But, as explained above, those documents are part of the parties' Agreements. Second, UBS argues that Plaintiffs cannot claim breach on the ground that UBS failed to pay competitive interest rates because the filing of the

Form ADVs is "mandated by federal law." *Id.* at 13.  Again, because Defendant chose to incorporate all of its disclosures to its clients in the Agreements rather than exempting mandatory federal disclosure documents from incorporation, it is immaterial that the Form ADVs are mandated by federal law—the Form ADVs are part of each Agreement and can supply contractual warranties, representations, or covenants.  UBS "fails to explain why a promise is unenforceable simply because it is contained in a document that [the defendant] is required to issue by regulation." *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *2; *see also In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055 at *7 ("Defendant do[es] not explain why a mandated disclosure cannot also create a contractual obligation.").

Finally, UBS suggests that Plaintiffs cannot sustain their breach claim based on any promise to pay "competitive rates" because the term "competitive" is too "indefinite and non-specific" to support a breach.[29]  Mem. at 12.  But because the term "competitive," when read in the context in which it appears, has a sufficiently definite meaning, this language is enforceable.  "Few principles are better settled in the law of contracts than the requirement of definiteness[:]  If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *accord Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 134–37 (2d Cir. 2005) (analyzing *Cobble Hill* and other New York Court of Appeals cases on indefiniteness in contracts).  The purpose of the definiteness requirement is twofold:  "*First*, unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy. . . .  *Second*, the requirement assures that courts will not impose contractual obligations when the parties did not intend to

---

[29] UBS also argues that "[s]ince depositors that find themselves unhappy with the interest rates paid by UBS could have availed themselves of other sweep options on the market, the sweep rates were necessarily competitive."  Mem. at 13.  To the extent that UBS raises this argument separately from its contention that the term "competitive" is too indefinite to support a breach of contract claim, it too is unpersuasive.  Contending that a non-breaching party unhappy with the other party's breach could take their business elsewhere does not remedy a breach in the first instance.

conclude a binding agreement." *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 482 (emphasis in original).

At the same time, "all the terms contemplated by [an] agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy." *Kolchins v. Evolution Mkts., Inc.*, 128 A.D.3d 47 (1st Dep't 2015). "Contracting parties are often imprecise in their use of language," and imprecision alone is not reason to find an agreement unenforceable. *In re 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991). As a result, "where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain." *Id.* In short, the definiteness requirement should not be applied rigidly, and a court simply looks to whether "it is able to determine what in fact the parties have agreed to." *Id.* "Striking down a contract as indefinite and in essence meaningless is at best a last resort." *Id.* (citation omitted).

Defendant's argument is not persuasive because it divorces the term "competitive" from its relevant context. The term "competitive" is not overly indefinite when read in context because the term is explicitly tied to rates offered by other cash sweep programs—"Interest rates . . . are competitive *relative to similar deposit sweep programs in the industry.*" CAC ¶ 34; 2022 ADVs at 48 (emphasis added). As a result, there is an "objective method" for determining whether UBS's interest rate is competitive—Plaintiffs can compare UBS's interest rates to similar deposit sweep programs in the industry. As noted above, that is exactly what Plaintiffs do by citing an industry-wide analysis comparing interest rates across 300 sweep programs across the country. CAC ¶¶ 150–53.

UBS cites the Second Circuit's decision in *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401 (2d Cir. 2023) in support of its argument that the term "competitive" is too indefinite to support Plaintiffs' breach of contract claim. Mem. at 12 (identifying *Martinez* as "illustrative"). But the

30

Second Circuit's decision in *Martinez* is factually distinguishable.[30]  In *Martinez*, the relevant contractual language stated that Plaintiff "will receive a competitive monthly variable price"—there was no additional specificity provided as to exactly what comparators the price would be "competitive" to.  88 F.4th 408.  The Second Circuit concluded that "[w]ithout a satisfactory definition of 'competitive,' any contractual promise to charge a competitive rate lacks the definiteness that New York law requires to make it enforceable."  *Martinez*, 88 F.4th at 416 (noting that the plaintiff "has not explained what she understands 'competitive' to mean").  Because here the term "competitive" is specifically tied to "similar deposit sweep programs in the industry," the contractual language at issue in this case does not suffer from the same indefiniteness as the language at issue in *Martinez*.  Accordingly, Plaintiffs have plausibly stated a breach of contract claim premised on UBS's alleged failure to set "competitive" interest rates.

### iv.   Promise to Not Charge "Excessive Fees"[31]

Plaintiffs have plausibly stated a breach of contract claim based on the theory that UBS charged "excessive fees" in violation of each Agreement.  The Agreements each state that—

> As your broker-dealer, we have a duty to deal fairly with you.  Consistent with our duty of fairness, we are obligated to make sure that the prices you receive when we execute transactions for you are reasonable and fair in light of prevailing market conditions and that the commissions and other fees we charge you are not excessive.

Dkt. No. 57-6 at 3; *see also* CAC ¶ 118.

To support the conclusion that the fee paid to UBS pursuant to its Cash Sweep Program is "excessive," Plaintiffs assert that UBS and its affiliates "function as highly profitable arbitrage operations of UBS . . . tak[ing] advantage of the nearly cost-free cash entrusted to it by its clients pursuant to the Sweep Program, and retaining for itself . . . the

---

[30] The procedural posture of the Second Circuit's decision in *Martinez* is also distinguishable—*Martinez* involved an appeal of a decision on a motion for summary judgment, not a motion to dismiss.

[31] For purposes of this opinion, the Court treats the statements discussed in this section as covenants imposing future obligations rather than present statements of fact but does not so hold.  *See supra* note 25.

vast majority of the profits generated by its clients' cash deposits." CAC ¶ 82. Because, for the majority of cash sweep participants, the first (and only) Program Bank to which cash is swept is UBS Bank USA—"UBS Bank USA [] derive[d] the primary benefit of the spread between the income generated and interest amounts paid on the deposits in the UBS Cash Sweep Program." *Id.* ¶ 73.

As a result, "UBS [] captures for itself a portion of the interest earned on its clients' cash balances as a 'fee,' and the higher that fee is for UBS, the lower the interest paid to UBS's clients." Opp'n at 12. Plaintiffs allege that "the windfall UBS received in [interest income] constituted an excessive fee, reaped directly from its clients' holdings."[32]CAC ¶ 80. At this stage, these allegations are sufficient to support the conclusion that UBS breached its obligation to ensure that it was not charging an "excessive" fee and correspondingly ensure that the interest rates paid to its clients were "reasonable." Accordingly, Plaintiffs have plausibly alleged that UBS breached each Agreement by paying itself an "excessive fee" and, in so doing, failing to secure a "reasonable" rate of interest for its clients.

V. **Plaintiffs Have Plausibly Pleaded a Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs plausibly assert a breach by Defendant of the implied covenant of good faith and fair dealing arising from Defendant's alleged arbitrary exercise of discretion that is separate and distinct from Plaintiffs' claim for breach of the Agreements. It is well-settled that "under New York law, 'implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (quoting *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308,

---

[32] Defendant asserts that "Plaintiffs impermissibly recharacterize the interest paid to Plaintiffs on uninvested cash through their participation in the Sweep Program as an 'excessive fee.'" Mem. at 10. But the CAC's allegations are clear: Plaintiffs challenge *the fee paid to UBS* as excessive and *the interest paid to Plaintiffs*, in light of that fee, as unreasonable. Opp'n at 12 (citing CAC ¶ 182).

318, (1995)). The implied covenant of good faith and fair dealing is a pledge that "'[n]either party to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract,' or to violate the party's 'presumed intentions or reasonable expectations.'" *Id.* (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)); *see also Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (same). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (quoting *Fishoff*, 634 F.3d at 653).

On the other hand, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (internal quotation omitted)). Additionally, the implied covenant does not include any obligation "inconsistent with the express terms of the contract," and it "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." [33] *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57 (2d Cir. 2017) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam)). Nor can the covenant "add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (alterations omitted) (quoting *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993)). Therefore, to plead both a breach of contract claim and an implied-covenant claim, a plaintiff must thread the

---

[33] Defendant asserts, alternatively, that Plaintiffs' implied-covenant claim must be dismissed because it is "inconsistent" with the terms of the Agreements, which provide that "rates on Deposit Accounts could be lower than rates offered by other depository institutions." Mem at 13–14. But, as discussed above with respect to Plaintiffs' breach of contract claim, this argument is not persuasive for at least two, independent reasons.

needle of "alleg[ing] an implied duty that is consistent with the express contractual terms, but base[d] . . . on allegations that are distinct from the factual predicate for its contract claims." *JPMorgan Chase Bank, N.A. v. IDW Grp.*, LLC, No. 08-cv-9116, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009).

Plaintiffs' implied-covenant claim adequately threads the needle. The "contracts provided UBS would . . . set rates based on prevailing business and economic conditions," and "[i]nstead[, Plaintiffs allege,] UBS used its discretion to deprive clients of the fruits of the contract." Opp'n at 15 (citing CAC ¶¶ 57–65, 130–38). Even though Defendant retained discretion when setting interest rates based on business and economic conditions, Plaintiffs have plausibly alleged that Defendant did not exercise its discretion "properly or reasonably" in "accounting for" those conditions. CAC ¶¶ 28 ("'Interest rates paid on funds . . . are determined by [UBS] . . . in [its] discretion based upon a variety of factors, including economic and business conditions.'" (quoting 2018, 2021 & 2024 A&Ds)); 187 ("Defendant was obligated to pay to, or secure for, Class members a fair and reasonable rate of interest . . . including by reasonably or properly accounting for current or prevailing business and economic conditions.").

These allegations support a claim distinct[34] from Plaintiffs' claim for breach of the Agreements. *Liberty Cap. Grp.*, 802 F. Supp. 3d at 715 ("The [] Program documents include an express promise to pay interest rates that vary with economic and business conditions. Hence, the CAC states an implied covenant claim based on alleged misconduct by Oppenheimer that frustrated Liberty from obtaining the benefits of that promise."); *Dey*, 780 F. Supp. 3d at 893 (concluding that under California law, Defendant "plausibly breached the implied covenant by exercising its

---

[34] Plaintiffs' implied covenant claim is not duplicative for an additional reason—"at this stage, it is uncertain whether [Plaintiffs] will be able to establish all the elements of [the] breach of contract [claim] because . . . [Plaintiffs] may not be able to show in what precise manner [Defendant] should have performed or to what precise extent customers were damaged." *Liberty Cap. Grp.*, 802 F. Supp. 3d at 715. "Accordingly, . . . 'there is no reason to bar [] plaintiff[s] from pursuing both types of claims in the alternative.'" *Id.* (quoting *Spinelli*, 903 F.3d at 206).

discretion to set its own fee in a manner that frustrated those provisions of the contract [requiring interest rates to be set based on 'prevailing market conditions'].").  Defendant's alleged misuse of discretion gives rise to a distinct claim under the implied covenant, as Defendant could have considered prevailing business and economic conditions, but done so "arbitrarily or irrationally." *Fishoff*, 634 F.3d at 653.  Accordingly, Plaintiffs have plausibly pleaded their breach of the implied covenant of good faith and fair dealing claim.

**VI.    Plaintiffs Have Plausibly Pleaded a Breach of Fiduciary Duty**

Plaintiffs have plausibly pleaded their breach of fiduciary duty claim because, as advisory account holders, Plaintiffs' respective Agreements establish the type of relationship sufficient to confer fiduciary obligations.  To state a cause of action for breach of fiduciary duty under New York law, "a plaintiff must allege:  (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."  *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (internal citations and quotations omitted); *see also Golobe v. Mielnicki*, 44 N.Y.3d 86, 93 (2025) (same).

Here, the parties dispute whether Plaintiffs have adequately pleaded the first element—the existence of a fiduciary relationship.  "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'"  *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) (quoting Restatement (Second) of Torts § 874 cmt. a (Am. L. Inst. 1979)).  "Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions."  *Id.* (citing *Ne. Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 162 (1993)).

A fiduciary relationship "may [] arise from the terms of a contract."  Restatement (Third) of

Torts: Liab for Econ. Harm § 16(a) (Am. L. Inst. 2020)).[35]  As a result, "where parties have entered into a contract, courts look to that agreement to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency." *EBC I*, 5 N.Y.3d at 19 (2005); *Sonnenschein v. Douglas Elliman-Gibbons & Ives*, 96 N.Y.2d 369, 374 ("[C]ourts must review the particular . . . agreements between the parties."); *see also Ne. Gen. Corp.*, 82 N.Y.2d at 164 ("[F]iduciary-like relationships or responsibilities, [] could [] [be] bargained for and specified for [] in the contract.").

Generally, "absent an express advisory contract, there is no fiduciary duty on [the] part of [the] broker-dealer" unless "special circumstances"[36] are present that "transform[] the [] relationship." *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972)); *as quoted in*, *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1308 (2d Cir. 2002).  "Because the inquiry as to whether a fiduciary relationship exists is 'necessarily fact-specific,' a 'claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6).'" *JPMorgan Chase Bank, N.A.*, 2009 WL 321222 at *9 (quoting *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (1st Dep't 1998); then quoting *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y.2006)).

The parties acknowledge that under New York law, the fact that UBS acted as a broker-dealer is, standing alone, insufficient to give rise to a fiduciary relationship under which UBS owed

---

[35] "The New York Court of Appeals has relied in the past on the Second Restatement of Torts to clarify ambiguous points of tort law." *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 119 (2d Cir. 2000); *see also EBC I*, 5 N.Y.3d at 19–20 (citing the Restatement (Second) of Torts when discussing whether a fiduciary relationship existed in a commercial setting).

[36] A court may find such "transformative special circumstances" in circumstances "that render the client dependent—a client who has impaired faculties, or one who has a closer than arms-length relationship with the broker, or one who is so lacking in sophistication that de facto control of the account is deemed to rest in the broker." *de Kwiatkowski.*, 306 F.3d at 1308.  Under such circumstances, "[t]he law thus imposes additional extra-contractual duties on brokers who can take unfair advantage of their customers' incapacity or simplicity." *Id.*  There is no indication (nor do Plaintiffs argue) that any such "transformative special circumstances" support a finding of a fiduciary relationship here—Plaintiffs are both sophisticated parties with prior investment experience. *See, e.g.*, Davitt CRA (identifying Plaintiff Davitt as an attorney with approximately thirty-five years of investment experience).

Plaintiffs ongoing fiduciary duties.[37]  *de Kwiatkowski*, 306 F.3d at 1308.; *see also Ne. Gen. Corp.*, 82 N.Y.2d at 162 ("If the parties find themselves or place themselves in the milieu of the 'workaday' mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them.").  But the parties spill much ink disputing whether UBS, when acting as a broker-dealer with respect to Plaintiffs' cash sweep accounts, exercised the kind of discretionary authority[38] that would nonetheless result in a fiduciary relationship.  The Court need not decide whether any such "de facto control and discretion" over Plaintiffs' cash sweep accounts means that UBS was acting in a capacity beyond that of an ordinary broker sufficient to give rise to a fiduciary relationship in this case. Rather, Plaintiffs have plausibly pleaded their breach of fiduciary duty claim for a simpler reason— because Plaintiffs "have advisory relationships with" UBS pursuant to their Agreements under which, UBS acknowledged it was acting as a fiduciary.[39]  CAC ¶¶ 29, 31.

---

[37] The "'mere existence of a broker-customer relationship is not proof of its fiduciary character.'" *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) (quoting *Rush v. Oppenheimer & Co.*, 681 F. Supp. 1045, 1055 (S.D.N.Y.1988)).  Rather, as the Second Circuit has explained, brokers performing solely nondiscretionary functions only owe fiduciary duties on a "transaction-by-transaction basis," *de Kwiatkowski*, 306 F.3d at 1302, and any such duties are properly cabined to the particular transactions the broker is obligated to perform—

> [A] broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis.  The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warning concerning the customer's investments. . . .  The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention.

*Id.* (collecting cases).  As a result, the relationship between a broker-dealer "is not by itself a fiduciary relationship although the addition of 'a relationship of confidence, trust, or superior knowledge or control' may indicate that such a relationship exists." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)).

[38] The Court does not reach this issue.  Nonetheless, those courts that have done so have concluded that all of Plaintiffs' arguments in support of their contention that non-advisory clients are owed ongoing fiduciary duties are not persuasive. *See e.g.*, *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055 at *10–*11 (rejecting same arguments made here); *Futo v. U.S. Bancorp*, No. 25-CV-1464, 2026 WL 252424 (D. Minn. Jan. 30, 2026) (rejecting arguments premised on a purported agency relationship between the parties and the banks "exercise of control and discretion over [swept] funds"); *Liberty Cap. Grp.*, 802 F. Supp. 3d at 716 (rejecting agency argument as to non-advisory clients).

[39] Because this case involves advisory accounts, it is factually distinguishable from other cash sweep cases involving only non-advisory and nondiscretionary brokerage accounts.  Indeed, those courts to have considered similar cash sweep cases have also drawn distinctions between advisory and non-advisory plaintiffs when determining whether a breach of fiduciary duty claim should be dismissed on a motion to dismiss in part because "[u]nlike with the advisory clients, nothing in the contracts with non-advisory clients expressly establish[d] a fiduciary relationship"). *See e.g.*, *In re Wells*

37

Plaintiffs have plausibly alleged that their accounts with UBS are "managed on an advisory basis," and that, "for [its] advisory clients," UBS "has a fiduciary [relationship] established by contract."[40] *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315 at *3 (finding that on analogous facts and contractual language, the contract with the advisory clients "expressly establishes a fiduciary relationship."); Dkt. No. 57-6.  In fact, UBS acknowledged the existence of a fiduciary relationship under Plaintiffs' Agreements, stating that "[w]hen you participate in one of our investment advisory programs, we are considered to have a fiduciary relationship with you . . . *under applicable state laws*."  Dkt. No. 57-6 (emphasis added); CAC ¶ 29; *see also* Davitt CRA at 5 ("[W]e are not held to the same legal standards that apply when we have a fiduciary relationship with you, as we do when providing investment advisory services.").[41] *But see Ne. Gen. Corp.*, 82 N.Y.2d at 163 (concluding that a fiduciary relationship did not exist between parties to a commercial transaction, in part because the parties' "agreement contains no cognizable fiduciary terms or relationship").

The existence of a fiduciary relationship created by contract can also be discerned "by the services agreed to under the contract between the parties." *Ne. Gen. Corp.*, 82 N.Y.2d at 163.  Where the parties "sign[] a contract in which [one party] agrees to represent [the other] and to take no action that might conflict with [the other's] interest . . . [the] contract create[s] a fiduciary relationship."  Restatement (Third) of Torts: Liab. for Econ. Harm § 16(c) ill. 5 (Am. L. Inst. 2020).  Here, Plaintiffs' Agreements identified specific fiduciary duties owed to advisory clients, stating that

---

*Fargo Cash Sweep Litig.*, 2025 WL 1785315 (applying New York law to conclude that "[t]he plaintiffs have stated a breach of fiduciary duty claim for advisory clients.  However, the claim is dismissed for non-advisory clients."); *Liberty Cap. Grp.*, 802 F. Supp. 3d at 716 (denying motion to dismiss fiduciary duty claim "as to advisory services customers" but concluding that the "CAC fails to state a claim for breach of fiduciary duty as to non-advisory services customers.").

[40] In the document titled "Conducting Business With UBS," UBS states that "[w]hen we act as your investment adviser, we generally will enter into a written agreement with you expressly acknowledging our investment advisory relationship with you and describing our obligations to you.  At the beginning of our advisory relationship, we will give you our Form ADV brochure, which provides detailed information about, among other things . . . the advisory services we provides . . . and conflicts between our interests and your interests."  Dkt. No. 57-6.

[41] Plaintiffs allege that "[i]t was not until March 31, 2023, that UBS's Form ADV added cautionary language attempting to disclaim its fiduciary duties" with respect to advisory accounts.  CAC ¶ 67.

"[UBS's] obligation include the obligation:"

- To disclose to you all material conflicts between our interest and your interests.
- To inform you if we or our affiliates receive additional compensation from you or from a third-party as a result of our relationship with you.
- To obtain your informed consent before engaging in transactions with you for our own account or that of an affiliate or another client when we act in an advisory capacity.
- To treat you and our other advisory clients fairly and equitably, without unfairly favoring one client to the disadvantage of another.
- To act in what we reasonably believe to be your best interests, and in the event of a conflict of interest, place your interests before our own.
- That any investment decisions or recommendations that we make to you must:
    - be suitable and appropriate for you.
    - be consistent with your investment objectives and goals.
    - reflect any restrictions you have placed on us.

Dkt. No. 57-6; CAC ¶ 26; *see also Liberty Cap. Grp.*, 802 F. Supp. 3d at 716 (S.D.N.Y. 2025) (concluding that for clients in the defendant's "advisory services programs" under which the defendant "expressly promised to 'act as a fiduciary,' including by acting in a customer's 'best interests'" the plaintiff had plausibly alleged that the defendant was a fiduciary); *JPMorgan Chase Bank, N.A.*, 2009 WL 321222 ("JPMorgan has alleged a relationship in which IDW served as its adviser . . . under circumstances in which it assumed . . . that IDW would act with JPMorgan's best interests in mind.").

In addition to the Agreements' plain language, Plaintiffs identify other facets of their Agreements supporting the conclusion that a fiduciary relationship existed between the parties. For example, Plaintiffs also allege that "[a]dvisory accounts with deposits in the UBS Cash Sweep Program were charged an advisory fee on the [ account's] allocated cash," one key indicia of the establishment of a fiduciary relationship pursuant to the Agreements. CAC ¶¶ 65, 68 (citing *In the Matter of Wells Fargo Clearing Servs., LLC, & Wells Fargo Advisors Fin. Network, LLC Respondents*, Release No. 6827 (Jan. 17, 2025) ("While Wells Fargo advisors maintained a duty to provide advice on cash and charged an advisory fee on the cash in advisory accounts . . . ")); *Muller-Paisner v. TIAA*, 289 F. App'x 461, 465 (2d Cir. 2008) (summary order) (noting that in determining whether a

39

fiduciary relationship exists, courts in other jurisdictions "have considered factors such as . . . whether or not the customer was paying the agent for advice"). Accordingly, because Plaintiffs have plausibly alleged an advisory relationship established by contract,[42] they have stated a common law claim against UBS for breach of fiduciary duty.

Finally, the Court notes briefly that Plaintiffs' breach of fiduciary duty is sufficiently factually distinct from, and accordingly not duplicative of, Plaintiffs' breach of contract claim. "[D]ismissal is not appropriate because it is 'reasonable to infer, under the liberal pleading standard of Rule 8, that the claim[ ] for . . . breach of fiduciary duty [is] based, at least in part, on facts other than those alleged in the breach of contract claim.'" *JPMorgan Chase Bank*, 2009 WL 321222 at *12 (quoting *E*Trade Sav. Bank v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 8065, 2008 WL 2902576, at *2 (S.D.N.Y. July 25, 2008)). Plaintiffs' breach of contract claim is premised on Defendant's alleged failure to pay rates in accordance with prevailing market conditions, failure to secure "competitive" rates, and the alleged imposition of excessive fees. CAC ¶¶ 178–83. By contrast, their breach of fiduciary duty claim is premised on Defendant's alleged failure to act in Plaintiffs' best interests or secure reasonable rates by acting in a self-serving manner to divert its clients' cash to low-yielding Deposit Accounts, *id.* ¶¶ 189–93. And, as Plaintiffs contend, they seek distinct remedies for their breach of fiduciary duty claim, including restitution, disgorgement of profits, and forfeiture of compensation, "which are generally unavailable for breach of contract." Opp'n at 23.

And the fact that Plaintiffs allege a fiduciary relationship arising from Plaintiffs' respective Agreements with UBS does not imply that the claims are duplicative—"[i]f a contract gives rise to a

---

[42] Defendant's argument that Plaintiffs' fiduciary duty claim fails because the CAC does not plead a breach of any duty mirrors its argument as to why Plaintiffs fail to plead a breach of contract. Mem. at 22 ("As discussed above, UBS paid interest rates on the Sweep Program in accordance with the parties' contractual terms."). The Court need not belabor the point again with respect to this cause of action: for the same reasons Plaintiffs have plausibly pleaded breach as to their contract claim and good faith and fair dealing claim, they have also plausibly pleaded breach with respect to their fiduciary duty claim.

fiduciary relationship, legal obligations may follow from the relationship that go beyond the terms of the contract." Restatement (Third) of Torts: Liab for Econ. Harm § 16(c) (Am. L. Inst. 2020) ("It may . . . become possible for a defendant to breach a fiduciary duty without breaching the contract that brought it about."). Accordingly, "conduct amounting to [a] breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract." *Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 524 (S.D.N.Y. 2018) (internal citation omitted). In sum, Plaintiffs have adequately pleaded their claim for breach of fiduciary duty.

## VII. Plaintiffs' Unjust Enrichment Claim is Duplicative of Their Breach of Contract Claim

Plaintiffs' claim for unjust enrichment is duplicative of Plaintiffs' breach of contract claim because Plaintiffs "assert[] no additional or different allegation[s] to support [the] unjust enrichment claim." *Dumontet v. UBS Fin. Servs.*, Inc., No. 1:21-CV10361-GHW, 2024 WL 1348752, at *9 (S.D.N.Y. Mar. 29, 2024). Under New York law, "claims in quasi-contract such as unjust enrichment and promissory estoppel are ordinarily precluded if a 'valid and enforceable written contract,' even an implied contract, 'govern[s]' the relevant 'subject matter.'" *Goldberg v. Pace Univ.*, 88 F.4th 204, 214 (2d Cir. 2023) (quoting *Beth Israel Med Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 587 (2d Cir. 2006) (quoting *ClarkFitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 (1987))); *EBC I, Inc.*, 5 N.Y.3d at 23 (same). This is because "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). The claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* As a result—

> An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim. And an unjust enrichment claim will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim

41

is not merely duplicative of their other causes of action.

*Campbell v. Whole Foods Mkt. Group, Inc.*, 516 F. Supp. 3d 370, 394 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).

That said, "even though [p]laintiffs may not ultimately *recover* under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to *plead* such claims in the alternative." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (emphasis in original); *see also Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir. 1996) (finding that a claim for unjust enrichment was "properly pleaded as such in the alternative to the [breach of contract claim]"); *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016) (reasoning that although "plaintiffs have adequately pled, for the purpose of surviving a motion to dismiss, that there was a valid and enforceable contract, this pleading does not estop them from pleading a quasi-contract claim in the alternative").  But "while it is true that a plaintiff may plead unjust enrichment and promissory estoppel claims in the alternative if there is 'a dispute over the existence, scope, or enforceability of the putative contract,' . . . there is no such dispute here." *Goldberg*, 88 F.4th at 215 (internal citations and quotations omitted).

Here, Plaintiffs' unjust enrichment claim is duplicative of their breach of contract claim because they "assert[] no additional or different allegation to support [the] unjust enrichment claim." *Dumontet*, 2024 WL 1348752, at \*9; *see In re 305 E. 61st St. Grp. LLC*, 130 F.4th 272, 283 (2d Cir. 2025) ("Two claims are duplicative of one another if they arise from the same facts and do not allege distinct damages." (internal citations and quotations omitted)); CAC ¶¶ 194–99 ("Plaintiffs . . . hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against Defendant UBS in the alternative to the preceding Claims to the extent it is duplicative of any such claim.").  Instead, Plaintiffs' unjust enrichment claim is premised on Defendant's alleged under-payment of interest to its sweep account clients in purported breach of the Agreements,

which is identical to Plaintiffs' breach of contract claims.[43]  *See* CAC ¶¶ 178–83.  The alleged

injustice is simply that Plaintiffs "received unfair and unreasonably low interest payment on their

cash sweep deposits" in violation of Defendant's obligations under the Agreements to set interest in

accordance with prevailing business and economic conditions.  *Id.* ¶ 195.

There is no ground on which Plaintiffs could prevail on their unjust enrichment claim if their

breach of contract claim fails.  *Corsello*, 18 N.Y.3d at 791 ("To the extent that these claims succeed,

the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust

enrichment claim cannot remedy the defects.").  Plaintiffs' unjust enrichment claim is "a mere

repackaging" of their breach of contract claim.  *Campbell*, 516 F. Supp. 3d at 394; *see, e.g., Smith v.

Apple, Inc.*, 583 F. Supp. 3d 554, 569 (S.D.N.Y. 2022) ("The plaintiffs do not explain why their unjust

enrichment claim is distinct from their other claims. . . .  Accordingly, the plaintiffs' unjust

enrichment claim must be dismissed."); *Cooper v. Mt. Sinai Health Sys., Inc.*, No. 1:23-CV-945-PAE,

2024 WL 3586357, at *12–13 (S.D.N.Y. 2024) ("The conduct underlying the [complaint's] unjust

enrichment claim is the same underlying its implied contract claim. . . .  The Court accordingly

dismisses this claim as duplicative.").  Accordingly, Plaintiffs' unjust enrichment claim is duplicative

of their other claims.

And because there is no continuing dispute as to the existence, validity, scope, or

enforceability of the Agreements, Plaintiffs cannot, without more, plead their unjust enrichment

claim in the alternative.  *Goldberg*, 88 F.4th at 215 (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d

253, 263 (2d Cir. 1999)) (dismissing unjust enrichment claims as duplicative where there is no

"dispute over the existence, scope or enforceability of the putative contract"); *Liberty Cap. Grp.*, 802

F. Supp. 3d at 701 (dismissing unjust enrichment claim in cash sweep case as duplicative of breach

---

[43] It is also duplicative of Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing and breach of
fiduciary duty claim.  *See* CAC ¶¶ 184–87, 189–93.

of contract claims because "there is no dispute" that the plaintiff and defendant "were in contract with each other with respect to the" sweep program at issue); *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315 at *4 (applying New York law to dismiss unjust enrichment claim as duplicative where "both parties agree that the contracts are valid and enforceable and cover the relationship between Wells Fargo and its cash sweep clients").

Plaintiffs contend that "there is a dispute over the [] ***scope*** . . . of the putative contract." Opp'n at 24 (quoting *Hofmann v. Long Island Univ.*, No. 22-393, 2024 WL 3262819, at *1 (2d Cir. Jul. 2, 2024) (summary order)) (emphasis in original). At most, Plaintiffs identify a dispute over the Agreements' terms, which does not necessarily equate to a dispute over the Agreements' scope. *Goldberg*, 88 F.4th at 215 ("But [the defendant] 'does not dispute on appeal that under New York Law some form of implied contract exists between it and [the plaintiff] . . . Rather, [the defendant] focuses on the terms of that implied contract."); *see in re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055 at *11 ("[B]ut the cases Plaintiffs cite demonstrate that a dispute over the contract's terms does not support an unjust enrichment claim."). The Second Circuit has affirmed dismissal of unjust enrichment claims under these circumstances—concluding that "there is no 'dispute over the existence, scope, or enforceability of the putative contract,'" where the parties "only dispute[] the terms of th[e] [] contract" but do "not dispute the existence" of the contract between them. *Tapinekis v. Pace Univ.*, No. 22-1058-CV, 2024 WL 2764146, at *2 (2d Cir. May 30, 2024) (summary order) (quoting *Goldberg*, 88 F.4th at 215); *see also Yodice v. Touro Coll. & Univ. Sys.*, No. 21-2986-CV, 2024 WL 3466546 (2d Cir. July 19, 2024) (summary order) ("Touro does not dispute that an implied contract exists between [the parties] regarding fees; it only disputes its terms."); *Hofmann*, 2024 WL 3262819, at *1 (2d Cir. July 2, 2024) (summary order) ("There is no dispute that an implied contract existed between Hofmann and LIU; rather, their dispute goes to the terms of the implied contract. Accordingly, Hofmann's unjust enrichment claim is entirely duplicative of his breach of contract

claims." (internal citations and quotations omitted)).  Accordingly, because Plaintiffs' unjust enrichment claim is duplicative of their breach of contract claim, the Court dismisses this claim.

## VIII.   LEAVE TO AMEND

The Court grants Plaintiffs leave to amend to cure the deficiencies identified above with respect to their claim for unjust enrichment.  It is the "usual practice" upon dismissing a complaint "to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  That is especially true where, as here, a plaintiff has not yet had the opportunity to amend the complaint with the benefit of a ruling from the Court.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  Nevertheless, leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (per curiam). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim . . ." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224–25 (2d Cir. 2017) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)).

The Court cannot conclude that any amendment of Plaintiffs' unjust enrichment against UBS is futile.  Plaintiffs could allege facts to support their claim for unjust enrichment that are distinct from the facts alleged in support of their breach of contract claim.  The Court understands that Plaintiffs may not wish to amend given that they pleaded their unjust enrichment claim only as an alternative to their breach of contract claims should the Court have dismissed their breach claim. Nonetheless, because the Court cannot conclude that any amendment is futile as a matter of law, the

45

Court grants Plaintiffs leave to amend the complaint to cure the deficiencies identified herein with respect to their unjust enrichment claim. Any amended complaint must be filed within 14 days of this order.

## IX. CONCLUSION

For the forgoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part. Defendant's motion is denied with respect to Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. Defendant's motion is granted with respect to Plaintiff's unjust enrichment claim. The Court dismisses Plaintiff's unjust enrichment claim without prejudice and with leave to amend.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 55.

SO ORDERED.

Dated: March 25, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge

46